COMPLIANCE
CORPORATION, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 90–3896C.

United States Claims Court.

Dec. 12, 1990.

Josephine L. Ursini, Washington, D.C., for plaintiff.

Reginald T. Blades, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen and Asst. Director Mary Mitchelson, for defendant. Greg Einboden, Dept. of the Navy, Patuxent River, Md, of counsel.

## OPINION

LYDON, Senior Judge:

This pre-award bid protest action arises from plaintiff's verified complaint seeking injunctive and declaratory relief relative to its disqualification from the bidding process during a bid solicitation for administrative support services conducted by the Navy. Plaintiff's complaint, filed October 31, 1990, is accompanied by a motion for temporary injunctive relief to prevent the Navy from awarding the contract until the dispute over plaintiff's disqualification has been resolved. Plaintiff's request for temporary injunctive relief was rendered moot when the Navy subsequently agreed to postpone awarding the contract until December 14, 1990. Defendant has answered and has moved for summary judgment. On December 11, 1990, a hearing was held on the merits of plaintiff's complaint and motion for injunctive relief. Based on the arguments presented at the hearing, and the documentary evidence before the court, the court finds the contracting officer's decision to disqualify plaintiff to be reasonable and rationally based in fact and law. Therefore, the court grants defendant's motion for summary judgment and denies plaintiff's request for injunctive and declaratory relief.

## FACTS

The material facts surrounding this dispute are uncomplicated and uncontroverted. Plaintiff Compliance Corporation (Compliance) is a small, minority-owned business corporation with its principal place of business in Lexington Park, Maryland. Defendant Department of the Navy (Navy), acting through the Naval Air Test Center in Patuxent River, Maryland, issued a Request for Proposals No. N00421–89–R–0114 on April 5, 1989, for administrative support services to be performed at the Naval Electronic Systems Engineering Activity (NESEA) in St. Inigoes, Maryland. From 1986 to the present, administrative support services have been provided to NESEA by the incumbent contractor, Eagan McAllister Associates (EMA).

The Request for Proposals was a total small business set-aside procurement worth approximately $3.2 million, and the contract performance period was to extend from October 1, 1989 through September 30, 1994, including all options. The Request for Proposals stated that the bids submitted would be evaluated on the basis of the bidder's technical approach, management approach, personnel, corporate experience, and cost realism. The contract would be awarded to the bidder that submitted a technically acceptable proposal with the lowest evaluated total estimated cost-plus-fixed-fee.

The Navy's deadline for the submission of cost and technical proposals was originally May 8, 1989, but the deadline was subsequently extended to June 16, 1989. Before the June 16th deadline, on June 2, 1989, a representative of EMA, the incumbent contractor who was also a competing contractor in the present bid solicitation, contacted the contracting officer alleging that certain Compliance employees had attempted to obtain information from EMA employees regarding EMA's bid proposal. The contracting officer referred EMA's complaint to the Naval Investigative Service (NIS) for investigation on June 3, 1989. Due to the pending investigation, the contracting officer on June 7, 1989, extended the deadline for receipt of proposals indefinitely until further notice.

Compliance first learned of EMA's allegations and the Navy's investigation when NIS agents contacted Compliance employees in June of 1989. The NIS did not contact or interview any officers of Compliance, and did not contact or interview any Compliance employees who prepared cost and technical aspects of the bid proposal.

On July 18, 1989, the contracting officer designated August 8, 1989 as the new deadline for submission of bid proposals. Compliance had not been notified as of July 18, 1989 that it might be or would be disqualified from bidding. Compliance timely submitted its bid on August 8, 1989. On that date, the Navy also received bids from EMA (the incumbent contractor) and two other corporations.

On August 9, 1989, the NIS investigation results were released to William Mohn, who was at the time procurement counsel for NESEA.

The following facts were uncovered by the NIS investigation. About two weeks before the May 8, 1989 original bid closing date, on April 23, 1989, Compliance's program director in charge of contracts, Norm Martin, approached Gloria Bailey, who was a word processor and assistant security manager for EMA, for information concerning EMA's bid proposal, as well as for information concerning EMA's current NESEA contract, including salary data. Martin, in his affidavit, advised that prior to April 23, 1989, he had lunch with Bailey at which time he discussed EMA's current contract with the Navy. Martin and Bailey were close personal friends who had previously worked together at Tracor, Inc., a Maryland defense contractor. In 1986, when Tracor lost the predecessor NESEA contract to EMA, Tracor terminated some employees, including Martin, who went to work for Compliance, and Bailey, who went to work for EMA. Bailey is related to the president of Compliance by marriage.

Bailey's position as a word processor at EMA gave her access to all proposal information, and at the time of her April 23, 1989 meeting with Martin, she was assigned to type and proofread EMA's bid proposal for the NESEA solicitation. Martin asked Bailey for EMA salary information, for a list of government-owned property used by EMA to perform the administrative support services contract at NESEA, and whether any EMA employees were interested in working for Compliance if Compliance received the contract at NESEA. Martin denies that he asked Bailey for a copy of EMA's proposal. Bailey and Martin also discussed the possibility of Bailey coming to work for Compliance, in view of Bailey's admitted unhappiness with working conditions at EMA.

On April 24, 1989, another EMA employee, Bruce Davidson, discovered a packet of information concerning EMA's technical proposal for the NESEA solicitation on Bailey's desk, which Davidson turned over to the president of EMA, James McAllister. The packet of information found on Bailey's desk consisted of EMA's technical data and capabilities, Bailey's personal resume, a blank performance review preparation sheet, a marked "Statement of Work" for the NESEA solicitation, an uncompleted "Supplies or Services and Prices" worksheet, a copy of EMA's bid proposal for the NESEA solicitation, handwritten notes of Bailey's April 23rd meeting with Martin concerning EMA salaries, and a handwritten memo by Marie Madden, another EMA employee and a close friend of Martin's and Bailey's.[1]

On April 25, 1989, according to EMA officials, Bailey told them she had been "compromised" on the NESEA solicitation as a result of her communications with Martin. According to her affidavit, Bailey told EMA officials on that date that she had been "solicited concerning the reports processing contract," but denied that she had been "compromised" in that regard. Bailey admitted to compiling the information Martin requested, but she denied that she ever intended to turn it over to him. However, Bailey admitted she gave Martin information on EMA salaries from three years ago. Bailey was unable to explain the presence of all the information discovered by Davidson in one package.[2] EMA

---

1. The record also indicates that when the president of EMA requested from Bailey the duplicate, back-up computer disk containing EMA's proposal, Bailey stated that she did not have a back-up copy. Bailey admitted that she usually makes a back-up copy of EMA's proposals, but she was too busy working on the proposal to do so in this case.

2. In the NIS report, as well as in Bailey's December 3, 1990 affidavit, Bailey stated that she took the packet of materials home with her

immediately placed Bailey on administrative leave. Shortly thereafter, EMA asked Bailey to resign, and she was terminated from EMA's employ.

In April of 1989, Martin asked another Compliance employee, Marie Madden, to compile information consisting of the names and telephone numbers of all EMA employees currently performing the administrative support services contract at NES-EA. Madden's job responsibilities include compiling a telephone directory for Compliance which contains a listing of the office phone numbers of on-site contractor personnel working at NESEA. Madden supplied Martin with the requested information, and also gave Martin additional information on EMA employees, consisting of their position descriptions, and the amount of time they spent working on-site at NES-EA. A copy of Madden's handwritten memorandum containing this information was found in the packet of materials on Bailey's desk.

In April or May of 1989, at Martin's request, Madden approached another EMA employee, Mary Forrest, a word processor who was working on the NESEA bid proposal for EMA. Forrest and Madden had also worked with Martin and Bailey at Tracor several years before, and the four were still close friends. In conjunction with her assignment to compile a telephone directory of all contractor employees working at NESEA, Madden asked Forrest for her suggestions and input regarding the telephone directory. Forrest claims she gave Madden only some information regarding EMA's health and retirement benefits. The above recitation concludes the results of the NIS investigation.

After the submitted bids had been evaluated and audited, and it was determined that Compliance's bid was within the competitive range, the Procurement Review Board reviewed the results of the NIS investigation, and on March 30, 1990, approved the disqualification of Compliance. On April 2, 1990, the contracting officer notified Compliance by letter of Compliance's disqualification from the solicitation. In the letter, the contracting officer stated that, based on the NIS investigation of EMA's allegations that a Compliance employee tried to gain, or did gain, "proprietary proposal information" from EMA, a competing contractor, Compliance was being disqualified "to protect the integrity of the procurement process." At that time, Compliance was not informed of the factual basis for the Navy's decision, nor did NIS consent to disclosure of its investigative report to Compliance.

On April 12, 1990, Compliance filed a timely protest of its disqualification with the Comptroller General of the General Accounting Office (GAO).[3] Compliance requested a protest conference and a copy of relevant documents, including the NIS report. NIS agreed to release a "sanitized" version of its report to Compliance, omitting some exhibits containing information allegedly protected as privileged under the Privacy Act. Counsel for Compliance have since gained access to the privileged information for the purposes of this litigation, subject to a protective order.

At Compliance's request, the GAO conducted a protest hearing on May 23, 1990, attended by representatives of Compliance, EMA and the Navy. Pursuant to statutory and regulatory provisions, award of the contract was automatically stayed pending the outcome of the GAO protest hearing. *See* 31 U.S.C. §§ 3553(c)(1), 3554(a)(1); 4 C.F.R. § 21.4(a).

On August 15, 1990, the Comptroller General's office of the GAO issued a decision denying Compliance's protest and request for reinstatement as a qualified bidder, holding that the contracting officer's decision to disqualify Compliance for ob-

---

during the weekend of April 22nd and 23rd. The packet of materials included EMA's bid proposal. Martin picked Bailey up at her home on April 23rd for their meeting.

**3.** The 1984 Competition in Contracting Act, 31 U.S.C. §§ 3551–3556 (1988), authorizes the GAO,

through the Comptroller General's office, to entertain protests by disappointed bidders relative to actions taken by the procuring agency. *See Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989).

taining, or attempting to obtain, proprietary proposal information from EMA was reasonable to protect the integrity of the procurement process. The Comptroller General specifically rejected Compliance's characterization of the alleged improper conduct as a dispute between private parties over which the Comptroller General's office had no jurisdiction. The Comptroller General explained that it clearly has jurisdiction to review the reasonableness of the contracting officer's decision to disqualify Compliance.

On August 20, 1990, Compliance filed a Motion for Reconsideration with the GAO. EMA filed its response on August 30, 1990. No response was requested from, or filed by, the Navy. On October 5, 1990, the GAO's Associate General Counsel told counsel for Compliance to expect a decision on the pending Motion for Reconsideration by October 31, 1990. On October 16, 1990, contracting officer Michael Leary advised counsel for Compliance that he expected to award the contract in early November of 1990. He reconfirmed this statement to Compliance officials on October 30, 1990. Consequently, Compliance filed on October 31, 1990 its verified complaint and accompanying motion for injunctive relief.

Compliance's complaint contains three counts. Count 1 alleges that the Navy has made an illegal *de facto* nonresponsibility finding in disqualifying Compliance. Count 2 alleges that the Navy breached its duty

to fairly and honestly consider Compliance's bid, and that its decision to disqualify Compliance lacked a rational basis. Count 3 echoes Count 2 in alleging that the Navy's decision to disqualify Compliance was improperly based. Compliance seeks injunctive relief to prevent the Navy from awarding the contract pending final adjudication of Compliance's complaint on the merits, and if Compliance prevails on the merits, to prevent the Navy from awarding the contract to any bidder other than Compliance. Compliance also seeks a declaratory judgment that the Navy improperly disqualified Compliance.

Pursuant to a conference call held on November 1, 1990, in which counsel for Compliance, EMA and the Navy participated, counsel for the Navy assured the court that no contract award would be made prior to November 16, 1990, thus eliminating the need for temporary injunctive relief. The Navy subsequently agreed to postpone awarding the contract until December 14, 1990. In addition, the court requested that the GAO proceed with its consideration of plaintiff's Motion for Reconsideration, and to make every effort to issue a decision on the motion by November 28, 1990. With admirable speed and efficiency, the GAO complied with the court's request, and issued a decision on the date requested, affirming its prior decision to uphold the contracting officer's disqualification of Compliance.[4]

---

**4.** In its second opinion, the Comptroller General concluded, based on the facts contained in the NIS report, that a contracting officer may properly protect the integrity of the procurement process by disqualifying a firm that engages in, or attempts to engage in, improper business conduct that may have afforded the firm an unfair competitive advantage. In reaching this conclusion, the Comptroller General noted that Federal Acquisition Regulations (FAR) require firms to certify that they have arrived at their prices independently, that they have not disclosed their prices to other competitors, and that they have not attempted to induce another firm to submit or refrain from submitting a bid for the purpose of restricting competition. *See* FAR § 52.203–2. Interestingly, the Comptroller General's opinion revealed that Compliance's bid was "substantially below" EMA's bid.

In addition, the Comptroller General relied on its prior decision in *NKF Engineering, Inc.,* 65 Comp.Gen. 104 (1985), and its affirmance by the

Federal Circuit, 805 F.2d 372 (Fed.Cir.1986), to conclude that a contracting officer has wide latitude to exercise his business judgment, including the ability to disqualify a firm for improper conduct to preserve the integrity of the competitive procurement system. The Comptroller General again rejected Compliance's argument that the conduct involved here does not affect the integrity of the procurement process. Nor did the Comptroller General agree with plaintiff's argument that the Comptroller General lacks jurisdiction to consider allegations of "industrial espionage" where no improper government conduct is involved. The Comptroller General reasoned that Compliance's conduct is "not significantly different from improper and illegal conduct by a former government official to obtain a competitive advantage for [a] private contractor," citing *Naddaf International Trading Co.,* B–238768.2, Oct. 19, 1990, 90–2 CPD ¶ __. Therefore, the Comptroller General

On December 5, 1990, defendant moved for summary judgment. Likewise, plaintiff requests that the court treat its motion for injunctive relief as a motion for summary judgment. A hearing on the merits of plaintiff's complaint was held on December 11, 1990.

## DISCUSSION

█ Pursuant to 28 U.S.C. § 1491(a)(3), the court has limited jurisdiction to grant injunctive relief in the area of pre-award bid protest disputes, such as this one. The court's power to grant injunctive relief before a contract is awarded rests on an implied-in-fact contract theory. An implied-in-fact contract arises between the bidder and the procuring agency when a bidder submits its bid in response to the agency's solicitation. In this case, an implied-in-fact contract arose between Compliance and the Navy when Compliance submitted its bid to supply administrative support services at the NESEA. This contractual relationship obligated the Navy to fairly and honestly consider Compliance's bid. *See, e.g., NKF Engineering, Inc. v. United States,* 805 F.2d 372, 375–76 (Fed.Cir.1986); *Data Transformation Corp. v. United States,* 13 Cl.Ct. 165, 171 (1987); *Harris Sys. Int'l, Inc. v. United States,* 5 Cl.Ct. 253, 260 (1984).

█ Pre-award injunctive relief is, however, an extraordinary remedy that must be exercised with caution. *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). In *Baird,* the Claims Court defined its limited scope of review in deciding whether to grant pre-award injunctive relief:

Judicial review of an agency's pre-award procurement decision is, and should be, extremely limited in scope. The court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determina-

tions were irrational or unreasonable. It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's determinations .... by clear and convincing evidence.

*Baird, supra,* 1 Cl.Ct. at 664 (citations omitted). *TRW Environmental Safety Sys., Inc. v. United States,* 18 Cl.Ct. 33, 43 (1989) (bidder must establish by clear and convincing evidence that agency's determination was unreasonable or irrational); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 740 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988) (same); *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983) (same).

Overturning a contracting officer's determination requires a showing that it is arbitrary, capricious or constitutes an abuse of discretion. *Prineville Sawmill Co. v. United States,* 859 F.2d 905 (Fed. Cir.1988). Where the procurement decision has a reasonable or rational basis, it is not contemplated that the Claims Court will intervene in the matter.

*Medical Devices of Fall River, Inc. v. United States,* 19 Cl.Ct. 77, 82 (1989). *See also NKF Engineering, supra,* 805 F.2d at 376 (Claims Court should interfere in procurement process only in extremely limited circumstances). Moreover, it is evident that the Claims Court is most reluctant to overturn a contracting officer's decision that has been upheld by the GAO, as it was here. "Given the specialized expertise of the GAO, [this court] should be especially reluctant to interfere with the procurement process when, as here, the GAO has upheld the contracting officer's decision." *Howell Constr., Inc. v. United States,* 12 Cl.Ct. 450, 452 (1987).

█ On the other hand, in order to obtain injunctive relief, Compliance, as the aggrieved bidder, need not show that it would have received the contract award "but for" the unreasonable or irrational

---

found no basis for distinguishing the case at bar from numerous prior decisions of the Comptroller General disqualifying firms for improper conduct involving a former government official. *See, e.g., Naddaf, supra; Litton Sys., Inc.,* 68 Comp.Gen. 422 (1989), 89–1 CPD ¶ 450, *aff'd, The Department of the Air Force—Recon.,* 68 Comp.Gen. 677 (1989), 89–2 CPD ¶ 228; *Holmes and Narver Servs., Inc./Morrison–Knudson Servs., Inc., a joint venture; Pan Am World Servs., Inc.,* B–235906; B–235906.2, Oct. 26, 1989, 89–2 CPD ¶ 379; *aff'd, Brown Assocs. Management Servs., Inc.—Recon.,* B–235906.3, Mar. 16, 1990, 90–1 CPD ¶ 299.

conduct; it is sufficient if Compliance proves its bid was within the range of active consideration and that there was a substantial chance of receiving the award if Compliance's bid had been fairly and honestly considered. *See TRW, supra,* 18 Cl.Ct. at 43.

In addition to the above considerations, the court must consider the following four factors in determining whether Compliance is entitled to injunctive relief:

[1] There is a substantial probability that Compliance will prevail on the merits of its complaint;

[2] Injunctive relief is within the public interest;

[3] Compliance will suffer irreparable harm, and cannot obtain adequate relief at law, if the injunction is not granted;

[4] The extent of injury to defendant if the injunction is granted (where the balance of hardship lies).

*TRW, supra,* 18 Cl.Ct. at 72. The court will first consider whether Compliance is entitled to injunctive relief on the merits of its complaint, which will determine whether it is necessary to consider the remaining three factors.

### The Merits of Compliance's Complaint

Both parties have moved for summary judgment, having agreed that there are no material facts in dispute, and that the case is ripe for summary judgment. Summary judgment is appropriate when there are no material facts in dispute, and the moving party is entitled to a judgment as a matter of law. RUSCC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986).

At oral argument, the parties posited the legal issues as whether an appearance of impropriety is a sufficient basis upon which to disqualify a bidder, and whether the contracting officer, on the facts before him, acted rationally and reasonably in disqualifying Compliance. These legal issues are for the court to resolve. No purpose would be served by a trial on the merits, given the lack of factual issues, and in view of the Federal Circuit's decision in *NKF Engi-*

*neering, supra,* which indicates that a factual inquiry into whether an actual impropriety has transpired is unnecessary. In that case, this court remanded the case to the contracting officer to make a factual determination as to whether an actual impropriety had occurred. The Federal Circuit vacated the court's decision, finding it unnecessary to probe the underlying facts, as the facts in the record supported an appearance of impropriety, which the appellate court found to be a sufficient basis for disqualification. *NKF Engineering, supra,* 805 F.2d at 377. Likewise, in the posture of the present case, the court feels a trial would be unnecessary.

Compliance's two principal arguments are that the contracting officer improperly disqualified Compliance (1) because the alleged conduct does not violate any law or regulation, and (2) because the alleged conduct does not affect the integrity of the procurement process. The contracting officer found that Compliance engaged in improper business conduct by obtaining, or attempting to obtain, proprietary information from EMA that may have afforded Compliance an unfair competitive advantage, and that the disqualification of Compliance was necessary to protect the integrity of the procurement process. The Comptroller General has twice upheld the contracting officer's decision to disqualify Compliance, most recently in its November 28, 1990 decision denying Compliance's Motion for Reconsideration.

### A. Propriety of Disqualification Absent Statutory or Regulatory Violation

■ Compliance contends that since there is no federal or state law or regulation that directly prohibits the type of conduct in which Compliance allegedly engaged, Compliance's conduct was neither improper nor illegal. Moreover, Compliance asserts that its disqualification was improper, as there is no statute or regulation authorizing the contracting officer to disqualify Compliance. Compliance does not vigorously deny the material facts underlying the allegedly improper conduct.

Rather, Compliance denies any improper motive propelled the conduct at issue.

In this case, the contracting officer based his decision to disqualify Compliance on the results of the NIS investigation into EMA's allegations that Compliance tried to obtain, or did gain, proprietary proposal information from EMA employees. The contracting officer concluded, on the basis of the NIS investigation, that Compliance's attempt to obtain proprietary information to gain an unfair competitive advantage created an appearance of impropriety that would taint the integrity of the procurement process. Thus, the contracting officer informed Compliance that it was being disqualified to "protect the integrity of the procurement process." Upon review of the contracting officer's decision, the Comptroller General found that the contracting officer was entitled to disqualify Compliance to protect the integrity of the procurement process "where it reasonably appeared that Compliance may have obtained an unfair competitive advantage." Therefore, without concluding that Compliance actually gained an unfair competitive advantage, the Comptroller General upheld Compliance's disqualification based on an "appearance of impropriety."

In justifying the disqualification of Compliance, both the contracting officer and the Comptroller General relied heavily on *NKF Engineering, Inc.*, 65 Comp.Gen. 104 (1985), 85-2 CPD ¶ 638. In *NKF Engineering*, the Comptroller General found that a bidder may be disqualified based on an appearance of impropriety where the bidder may have gained a competitive advantage through a conflict of interest when it hired a former contracting officer's representative who had worked on the solicitation in dispute. The bidder was found to have reduced its final bid by thirty-three percent after hiring the former government official. *NKF Engineering, supra.* Although the Claims Court in *NKF Engineering* reversed the Comptroller General's decision (9 Cl.Ct. 585), the Federal Circuit reversed the Claims Court and affirmed the Comptroller General's decision. *See NKF Engineering, Inc. v. United States*, 805 F.2d 372 (Fed.Cir.1986). The

Claims Court based its reversal on the Federal Circuit's decision in *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed.Cir. 1983), which the Claims Court read as holding that an otherwise qualified bidder may not be disqualified based on a mere "appearance of impropriety." *NKF Engineering*, 9 Cl.Ct. at 592.

In affirming the Comptroller General's decision in *NKF Engineering*, the Federal Circuit distinguished its decision in *CACI, supra*, on the grounds that the facts in that case did not support a finding of an appearance of impropriety. *NKF Engineering, supra*, 805 F.2d at 376. By contrast, on the facts before it in *NKF Engineering*, the Federal Circuit concluded that actual impropriety need not be shown since the agency's decision to disqualify NKF based on an appearance of impropriety was rationally based and supported by the facts of the case. *NKF Engineering, supra*, 805 F.2d at 376. The court specifically found that, regardless of whether any inside information was actually obtained by the bidder, "the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify NKF." *NKF Engineering, supra*, 805 F.2d at 376.

In reaching this conclusion, the Federal Circuit took the view that a contracting officer has the authority to disqualify a bidder to protect the integrity of the procurement process from the appearance of impropriety and the potential for an unfair competitive advantage, even in the absence of any statute or regulation specifically authorizing disqualification on such grounds. The Federal Circuit reasoned as follows:

Despite the seeming absence of any authority expressly authorizing the actions that were taken in this case[,] the court is of the view that the contracting officer's responsibility of "safeguarding the interests of the United States in its contractual relationships," 48 C.F.R. § 1.602.2 (1985), is sufficient to support the exercise of authority that was asserted. What persuades us to this view is the latitude courts have historically shown with respect to the contracting

officer's basic authority to enter into, administer, or terminate contracts ... and the overriding importance of the Government's need to insure full and fair competition in the conduct of its procurements. A procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness.

*NKF Engineering, supra,* 805 F.2d at 377 (citations omitted).

The Federal Circuit's opinion in *NKF Engineering* clearly rejects plaintiff's argument that its disqualification was improper because it was not based on a violation of a statute or regulation, as well as plaintiff's argument that the contracting officer's decision to disqualify Compliance was improper because it was not expressly authorized by statute or regulation. The same reasoning in *NKF Engineering* can be appropriately applied under the circumstances of this case. Like *NKF Engineering,* in this case there is apparently no rule or regulation directly prohibiting the type of conduct alleged, *i.e.,* obtaining or attempting to obtain another bidder's proprietary information in order to gain a competitive advantage. Nor is there a statute or regulation expressly authorizing the contracting officer to disqualify Compliance based on an appearance of impropriety. However, in *NKF Engineering* the Federal Circuit found the contracting officer's authority to disqualify Compliance based on an appearance of impropriety is inherent in his duty to "safeguard[ ] the interests of the United States in its contractual relationships," citing 48 C.F.R. § 1.602.2 (1985). *NKF Engineering, supra,* 805 F.2d at 377. Moreover, the Federal Circuit emphasized that when a contracting officer perceives a strong appearance of impropriety in a situation not covered by a statute, it would "undermine Congressional concern in the conflict of interest area to tie the hands" of

the contracting officer. *NKF Engineering, supra,* 805 F.2d at 377.

Plaintiff also argues that the following allegations, even if true, do not constitute improper or illegal conduct, and thus are not a proper basis for disqualification: Compliance's recruitment of EMA employees, EMA's discovery of the packet of materials found on Bailey's desk, and Compliance's use or attempted use of a NESEA data base or telephone directory. This argument misses the point of *NKF Engineering,* however. Even assuming the conduct itself was devoid of improper motives, what remains is the appearance of impropriety, which is a proper basis for disqualification. *NKF Engineering, supra,* 805 F.2d at 376–77.

B. Effect of Alleged Conduct on Integrity of Procurement Process

■ Compliance argues that its conduct, which Compliance characterizes as "industrial espionage," even if true, does not affect the integrity of the procurement process, for the following reasons. First, Compliance argues that only when collusion or price-fixing is involved can "industrial espionage" affect the integrity of the procurement process. Second, Compliance argues that "industrial espionage" involving two contractors without improper government action cannot be the sole basis for disqualifying a bidder to protect the integrity of the procurement process. Compliance maintains that there is no evidence in this case of an actual or apparent conflict of interest involving any government official, and therefore the two Comptroller General decisions upholding the disqualification of Compliance "represent a significant departure from well-established legal principles." [5] Third, Compliance argues that it may not be disqualified for obtaining or attempting to obtain information to gain an unfair competitive advan-

---

**5.** Plaintiff's argument fails to take into account not only the Federal Circuit's decision in *NKF Engineering, supra,* but also several Comptroller General decisions affirming the rationale of *NKF Engineering. See International Resources Group, Ltd.,* B–234629.2, Aug. 31, 1989, 89–2

CPD ¶ 196; *Laser Power Technologies, Inc.,* B–233369, B–233369.2, Mar. 13, 1989, 89–1 CPD ¶ 267; *Imperial Schrade Corp.,* B–223527.2, Mar. 6, 1987, 87–1 CPD ¶ 254; *RCA Service Co.,* B–224366, Aug. 28, 1986, 86–2 CPD ¶ 241.

tage when, in fact, Compliance received no such information.

Compliance contends that the Comptroller General has repeatedly held that the type of conduct Compliance allegedly engaged in here does not affect the integrity of the procurement process, unless either collusion, price-fixing, or improper government conduct that creates an actual or apparent conflict of interest is involved. A close reading of these decisions reveals the fallacy in plaintiff's position. It is true that the Comptroller General has often held, during the past decade, that allegations of the use by one bidder of proprietary information improperly gained from another bidder is a dispute between private parties that does not affect the propriety of the procurement, and is not a dispute for the Comptroller General to resolve, but rather is for the courts to resolve. *See, e.g., Radio TV Reports, Inc.,* B–224173, Sept. 24, 1986, *aff'd on recon.,* B–2241.3.2, Oct. 7, 1986; *Empire State Medical, Scientific & Educational Found., Inc.,* B–238012, March 29, 1990, 90–1 CPD ¶ 340; *Sublette Elec., Inc.,* B–232586, Nov. 30, 1988; *Gallegos Research Group,* B–227037, May 8, 1987, 87–1CPD ¶ 496; *Washington State Commission for Vocational Education—Recon.,* 64 Comp.Gen. 681, B–218249.2, July 19, 1985, 85–2 CPD ¶ 59; *DelRocco & Sons, Inc.,* B–218314, March 22, 1985; *Kirk–Mayer, Inc.,* B–208582, Sept. 2, 1983, 83–2 CPD ¶ 288; *SETAC, Inc.,* 62 Comp.Gen. 577, B–209485, July 25, 1983. The Comptroller General has indicated in other cases that when the government has no role in actions that result in a bidding firm gaining an unfair competitive advantage, the allegations of unfair competitive advantage constitute a dispute between private parties for resolu-

tion through the courts. *See, e.g., Gallegos Research Group, supra; JWK International Corp.,* B–234994.2, Oct. 17, 1989; *Advanced Systems Technology, Inc.,* B–235327, Aug. 27, 1989, 89–2 CPD ¶ 184; *National Test Pilot School,* B–237503, Feb. 27, 1990, 90–1 CPD ¶ 238.

However, the Comptroller General distinguishes these decisions from the present case by explaining that, unlike this case, those cases did not involve agency action, but rather they involved situations where the aggrieved bidder complained of the offending conduct of a competing bidder directly to the GAO, rather than to the procuring agency. GAO functions as an adjudicative forum for allegations that a procuring agency has not properly executed its contracting function. *See, e.g., Honeywell, Inc. v. United States,* 870 F.2d 644, 647 (Fed.Cir.1989); *MDT Corp.,* B–236903, Jan. 22, 1990, 09–1 CPD ¶ 81. For that reason, the GAO will not adjudicate disputes between private parties, and declines to exercise its jurisdiction in such cases. That is not the case here, however. EMA complained first to the contracting officer, who disqualified Compliance. Compliance then protested the contracting officer's decision to the GAO, which properly exercised its adjudicative function when it reviewed the contracting officer's decision to disqualify Compliance.[6]

Compliance would have the court distinguish *NKF Engineering* from the instant case, on the basis that *NKF Engineering* involved a potential conflict of interest resulting from the possibility that a former government employee may have obtained a competitive advantage for the disqualified

---

6. Plaintiff argues strenuously that the GAO's decision to uphold the contracting officer's disqualification of Compliance is contrary to prior GAO decisions such as *Empire State Medical, Scientific and Educational Foundation, Inc.,* B–238012, Mar. 29, 1990, 90–1 CPD ¶ 340, and *Kirk–Mayer, Inc.,* B–208582, Sept. 2, 1983, 83–2 CPD ¶ 288. Plaintiff reads *Empire State* and *Kirk–Mayer* as indicating that, in upholding the contracting officer's declination to disqualify a bidder, the GAO found that "industrial espionage" between two bidders not involving

government action does not affect the integrity of the procurement process. In this case, however, the GAO did not find its affirmance of the contracting officer's decision to disqualify Compliance inconsistent with its prior decisions. To the extent that plaintiff reads these prior GAO decisions accurately, the court cannot accept the proposition that "industrial espionage" involving competitive bidders but not involving government actions cannot serve as a basis for bidder disqualification by a contracting officer.

bidder.[7] Although this case is outside the conflict of interest area, as it does not involve actual or apparent improprieties on the part of a government agent, there is no persuasive reason to treat this case differently from a conflict of interest situation. Given the contracting officer's broad discretion to oversee the procurement process and to protect its integrity from the appearance of impropriety, the court finds the contracting officer acted reasonably in disqualifying Compliance. The NIS investigation clearly supports a finding that Compliance's conduct in attempting to obtain proprietary information from EMA created the appearance of impropriety which necessitated the disqualification of Compliance to protect the integrity of the procurement process.

Compliance argues that, since it received no proprietary information, the integrity of the procurement process is not affected. However, that argument was squarely rejected in *NKF Engineering, supra,* 805 F.2d at 376, which held that actual impropriety need not be shown. Moreover, the fact that a former government official was involved in *NKF Engineering* is not sufficient to distinguish it from the present case. Even assuming that Compliance's motives were above reproach in seeking information relative to EMA's bid proposal, it appeared from Compliance's outward conduct that it was seeking an unfair competitive advantage. Both EMA and the contracting officer thought as much, and the court is inclined to agree. When it appears that a bidder may have prepared its bid proposal with knowledge of its competitor's bid, such an appearance taints the integrity of the procurement process, regardless of whether any proprietary information was actually obtained or used. Furthermore, there is no evidence, and plaintiff does not allege, that the contracting officer acted in bad faith when he decided to disqualify Compliance. Such a decision is a judgment call, and a government official is presumed to carry out his duties in good faith, absent strong proof to the contrary. *See Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786 (1978); *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954). Moreover, it

7. Plaintiff seeks to distinguish *NKF Engineering* on the basis that a former government official was involved in the conduct at issue in that case, unlike the case at bar. This is a distinction *without a difference. As noted above, the* Comptroller General has, on occasion, viewed allegations of improper conduct not involving a government official as a dispute between private parties that does not affect the propriety of the procurement, *see, e.g., Radio TV Reports, Inc.,* B–224173, Sept. 24, 1986, *aff'd on recon.,* B–22473.2, Oct. 7, 1986; and *JWK International Corp.,* B–234994.2, Oct. 17, 1989, but only when the Comptroller General is not reviewing the functions of the procuring agency. In this case, the Comptroller General clearly had jurisdiction to review the reasonableness of the contracting officer's decision to disqualify Compliance. In essence, plaintiff reads these GAO decisions as supportive of its position in this case, *i.e.,* improper conduct by a competitive bidder cannot affect the integrity of the procurement process. The court cannot accept this position. Plaintiff intimates that perhaps actual and proven conduct, *i.e.,* obtaining a competitor's bid proposal by "industrial espionage" might affect the integrity of the procurement process, but the mere "appearance" generated by such conduct does not. *NKF Engineering, supra,* rejects such a distinction.

The court views with disfavor the type of conduct alleged here, which plaintiff itself characterizes as "industrial espionage." Moreover, when one bidder attempts to obtain, or does obtain, vital bid information, such as the bid proposal, or employee data, from a competing bidder, then the integrity of the procurement system is at risk. This type of conduct undermines the competitive aspect of the bidding process. To accept plaintiff's position is to condone "industrial espionage," if one is crafty enough not to get caught. Like Caesar's wife, bidders in their dealings with each other relative to a common procurement must be above reproach. Appearances under such circumstances can cast a pall over the procurement process and thus undermine the integrity of the process.

One of the contracting officer's duties in protecting the integrity of the procurement process is to ensure that each bid is fairly and honestly considered, which cannot be done unless each bid is fairly and honestly prepared. Surely, allowing bidders to underbid their competitors by means of "industrial espionage" falls within the realm of conduct that impugns the integrity of the procurement, and which is the type of conduct the contracting officer has a right and a duty to deter. By applying these considerations to "appearances" as to conduct by bidders in relation to competitive bidders, the court believes the deterrent effect of such a ruling will serve to preserve and protect the integrity of the procurement process.

cannot be said that the contracting officer may have been favoring the incumbent contractor EMA when he decided to disqualify Compliance, as there were two other bidders within the competitive range.

The court finds actual or attempted "industrial espionage" to be outside the realm of normal business practices, and the contracting officer is entitled to disqualify those who engage in such conduct, not only to protect the integrity of the contracting process, but also to deter others from similar conduct. Furthermore, as noted above, the court should not substitute its judgment for that of the contracting officer, and the court is especially reluctant to overturn the decision of a contracting officer when it has been twice affirmed by the Comptroller General.[8] *See Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 612 (1983); *Baird, supra,* 1 Cl.Ct. at 664.

C. Compliance's Other Allegations

■ Compliance argues that, since it is a small business, the Navy was required to refer the disqualification matter to the Small Business Administration; because the Navy's disqualification of Compliance was, in effect, a determination that Compliance was not a "responsible" bidder. Compliance contends that the Navy's failure to refer the matter to the SBA deprived Compliance of the "safeguards of the review process." Compliance argues that, if the contracting officer believed Compliance's conduct was "improper," he should have made a nonresponsibility determination, as required by Federal Acquisition Regulation (FAR) § 9.104–1. Compliance points out that FAR § 19.602 requires a contracting officer to refer a determination that a small business is not "responsible" because it lacks, for example, competency, capability, capacity, credit, integrity, perseverance

or tenacity, to a regional SBA office before awarding the contract. Compliance argues that its disqualification implicates its integrity, which is an element of "responsibility" under the FAR, citing, *inter alia, Charleston Auto Processors, Inc.,* B–235369, May 11, 1989, 89–1 CPD ¶ 448; *MOHEAT, Inc.,* B–239378, May 3, 1990, 90–1 CPD ¶ 446.

A strikingly similar argument was rejected by the Federal Circuit in *NKF Engineering, supra.* In that case, the Federal Circuit found that the bidder was disqualified for an appearance of impropriety that had nothing to do with the bidder's status as a small business, or its ability to perform the contract. Moreover, the court specifically found that NKF's disqualification on the basis of the appearance of impropriety did not relate to NKF's integrity, but rather the disqualification focused on the integrity of the bidding system. Therefore, the Federal Circuit found that the Small Business Act did not require the contracting officer to refer the matter to the SBA before disqualification. *NKF Engineering, supra,* 805 F.2d at 378. The same reasoning applies in this case. The disqualification of Compliance had nothing to do with its status as a small business. The Small Business Act, the Small Business Administration, and the FAR that plaintiff relies on are all aimed at preventing discrimination against small businesses "solely because of their smallness." *See Electro–Methods, Inc. v. United States,* 3 Cl.Ct. 500, 508 (1983), *aff'd in part and rev'd in part on other grounds,* 728 F.2d 1471 (Fed.Cir.1984). Accordingly, the court rejects Compliance's argument that its disqualification is a *de facto* finding of nonresponsibility that must be referred to the Small Business Administration for a responsibility determination.[9]

---

**8.** Although Comptroller General decisions are not binding on the Claims Court, such decisions "when reasonable and persuasive" provide useful guidance to the court. *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 821 n. 13 (1989), *aff'd,* 914 F.2d 271 (Fed.Cir.1990); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). However, plaintiff concludes from these GAO decisions that "industrial espionage" does not

create an appearance of impropriety for disqualification.

**9.** To the extent that plaintiff relies on Comptroller General decisions indicating that allegations of bidder misconduct involve the bidder's responsibility as a prospective contractor, this reliance is unavailing in light of *NKF Engineering, supra,* 805 F.2d at 378. Decisions of the GAO are not binding on the Claims Court, *see RADVA Corp. v. United States,* 17 Cl.Ct. 812, 821 n. 13

■ Finally, Compliance argues that it was deprived of due process because it was not given an opportunity to respond to EMA's charges against it or to challenge the NIS investigation before the contracting officer disqualified Compliance. The court finds this argument to be unavailing. In *NKF Engineering, supra,* the Federal Circuit rejected a similar due process argument. In that case, the court found that the bidder's participation in a protest hearing conducted by the GAO gave the bidder an opportunity to be heard "at a meaningful time and in a meaningful manner," and thus fundamental due process requirements were satisfied. *NKF Engineering, supra,* 805 F.2d at 377–78. Before filing suit in this court, Compliance participated in a protest hearing conducted by the GAO, in which EMA and the Navy also participated. More importantly, plaintiff has been given its day in court wherein it utilized discovery and was granted a hearing. It is not entitled to more than that. Therefore, the court finds due process requirements have been satisfied here. Furthermore, although Compliance complains that the NIS investigation was not complete, accurate or thorough, Compliance fails to identify any significant deficiencies in the NIS report. Compliance merely complains that no officers of Compliance were interviewed, nor were any of the Compliance personnel who prepared the technical and cost aspects of the bid proposal. Since none of these people appear to have been involved in the improper conduct alleged, the court finds this argument lacks merit. The crucial fact is that the mere appearance of impropriety is a proper basis for disqualification of a bidder from a government procurement. *NKF Engineering, supra.* The facts relied on by the contracting officer rationally support his decision to disqualify plaintiff as a bidder from the procurement in question. It is not the court's function to substitute its judgment for the contracting officer's judgment under such circumstances. *See Dynamics Corp. of America v. United States,* 182

(1989) *aff'd,* 914 F.2d 271 (Fed.Cir.1990), but decisions of the Federal Circuit are binding on

Ct.Cl. 62, 71–72, 389 F.2d 424, 429 (1968). Plaintiff does not assert that the contracting officer acted in bad faith.

■ Plaintiff bemoans the fact that there were no standards relative to disqualification of a bidder based solely on the appearance of impropriety which affects the integrity of the procurement process. Counsel cited the absence of statute, regulation or case law in this area, suggesting that such absence indicates that disqualification under these circumstances lacks any rational foundation. However, the Federal Circuit in *NKF Engineering, supra,* indicated that the contracting officer has appropriate authority to disqualify a bidder based solely on the appearance of impropriety when, in his honest judgment, it is necessary to do so to protect the integrity of the procurement process. *NKF Engineering,* 805 F.2d at 377. Obviously, his exercise of judgment in this regard will vary depending on the facts in each case. *See Dynamics Corp., supra,* 182 Ct.Cl. at 71–72, 389 F.2d at 429 (court should not substitute its judgment for that of contracting officer in making factual determinations). The establishment of standards is not feasible under such circumstances. The guiding principle is reliance on the exercise of rational and reasonable discretion by the contracting officer in fulfilling his mandate to protect the integrity of the procurement process. In this area, as indicated in *NKF Engineering, supra,* it would be unwise to tie the hands of the contracting officer by insisting on rigid standards. *See NKF Engineering, supra,* 805 F.2d at 377.

At oral argument, counsel for Compliance indicated that "industrial espionage" may be "immoral," but noted that it is, nonetheless, a common business practice, and is otherwise not controlled by statute, regulation or case law. Plaintiff argues that any appearance of impropriety involving "industrial espionage" should not be accepted as a basis for disqualification absent congressional or regulatory direction.

the Claims Court.

The court does not accept this view of the law. Contractors who contemplate initiating improper contact with competing bidders to gain a competitive advantage in the bidding process may well, if discovered, face disqualification from the bidding process. The appearance of "industrial espionage," no matter how commonplace it has become, should not be part and parcel of the procurement process.

Based on the foregoing discussion, the court finds Compliance is not entitled, on the merits of its complaint, to injunctive or declaratory relief. The contracting officer acted rationally and reasonably in disqualifying Compliance based on an appearance of impropriety to protect the integrity of the procurement process. Compliance has failed to approach the level of proof required, that is, to show by clear and convincing evidence that the contracting officer acted arbitrarily, capriciously, or irrationally in his decision to disqualify Compliance.[10] Since the court finds Compliance fails on the merits of its complaint, the court need not consider whether injunctive relief would be in the public interest, or whether Compliance would suffer irreparable harm if injunctive relief is not granted, or the extent of harm to the Navy if the injunction is granted. *TRW, supra,* 18 Cl.Ct. at 72.

## CONCLUSION

For the foregoing reasons, the court finds the contracting officer's decision to disqualify Compliance from the bidding process to be reasonable and rationally based in fact and law. Therefore, plaintiff is not entitled to injunctive or declaratory relief. Defendant's motion for summary judgment is hereby granted. The Clerk of the court is directed to enter judgment dismissing plaintiff's complaint. No costs.

---

**10.** Compliance asserts that the "preponderance of the evidence" standard as articulated in *Quality Transport Services, Inc. v. United States,* 12 Cl.Ct. 276, 281 (1987), is the correct standard of proof for the court to apply in reviewing the contracting officer's decision, rather than the "clear and convincing" standard of *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). Though the court does not agree with plaintiff's argument, nevertheless, the court finds plaintiff has failed to meet its burden of proof under either standard.