VANTAGE ASSOCIATES, INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 03–340C.

United States Court of Federal Claims.

Aug. 7, 2003.[1]

1. This opinion was issued under seal on August 7, 2003. The parties were instructed to identify protected material subject to redaction. In response, the parties have stipulated that the opinion does not contain protected material. The original opinion is, therefore, reissued unsealed.

Brian J. Donovan, Jones & Donovan, Newport Beach, CA, for the plaintiff.

David R. Feniger, Trial Attorney; Bryant G. Snee, Assistant Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.; and Robert D. McCallum, Assistant Attorney General, for the defendant.

## OPINION

HORN, Judge.

## FINDINGS OF FACT

On March 11, 2002, the United States Navy issued a request for proposals (RFP) through solicitation no. N63394–02–R–4001 for the manufacture, test, and delivery, in the first year, of sixty gray search radome assemblies and sixty gray track radome assemblies for the PHALANX MK 15, Close in Weapons System (PHALANX). The Naval Surface Warfare Center, Port Hueneme Division, Louisville, Kentucky initiated the procurement. The PHALANX system, installed on most Navy combatant ships, is a radar-controlled six-barrel gatling gun that projects a curtain of bullets as the last line of defense against missile attacks. Radomes, gel-coated fiberglass sandwich structures with a foam core, cover the radar systems that control the operation of the PHALANX. Radomes also protect the PHALANX electronic equipment from the wide variety of environmental conditions encountered at sea and must comply with precise electrical characteristics so that radio frequency (RF) transmissions, upon which the PHALANX system depends, can flow unimpeded through the radome. If the radome is not transparent to RF waves, the entire PHALANX system could be seriously degraded or rendered useless.

The Navy currently deploys white radomes, although the remainder of the PHALANX system (for which the radomes provide protective cover), and the majority of the ships, are painted haze gray. White radomes present a more conspicuous target for enemy fire than gray radomes, because gray radomes blend with the paint scheme of the ship. Louis J. Alpinieri, Chairman and CEO of plaintiff Vantage, Inc., stated that, "[i]n recent years the Navy ... became concerned that the white radomes were essentially an aiming point for hostile aircraft and missiles."

Raytheon has a sole source contract with the Navy for the design of the PHALANX system and responsibility for, among other things, all engineering and testing of the PHALANX system. Additionally, Raytheon operates a facility for refurbishing PHALANX systems in Louisville, Kentucky, co-located with the Naval Surface Warfare Center, Louisville Office that conducted the pro-

curement at issue. Raytheon's corporate history is necessary to understand the documents in the record and to address plaintiff's organizational conflict of interest claim. General Dynamics Corporation was the original government contractor for the design, development, and production of the PHALANX system. On May 8, 1992, Hughes Aircraft Company purchased the assets of General Dynamics' missile division, including the PHALANX system. General Dynamics and Hughes Aircraft signed a "Closing Agreement" and a novation agreement on August 21, 1992. Raytheon later acquired Hughes Aircraft, including the PHALANX system, in an agreement executed on December 16, 1997. As a result, Raytheon's proposal for the solicitation at issue states that Raytheon is the original equipment manufacturer of the PHALANX and designed the original PHALANX Radome in the 1970s.

On June 24, 2000, after the Navy had tasked Raytheon with publishing a pilot lot inspection (PLI) report, Raytheon did so and included results of several tests performed on gray radomes manufactured by Vantage, Inc. for fleet use. Although Raytheon published the report and conducted a majority of the tests included in the PLI report, Derby City Engineering performed the Mechanical Load Testing on Vantage's radomes. During the test. Derby City Engineering "made a fixture for applying loads to the handle mounting holes," and concluded that only three of the ten mounting holes on Vantage's gray radome passed the tear out loading test. Vantage had objected in April, 2000 to the "testing of its gray radomes by its competitor, Raytheon, and suggested that both [Vantage] and Raytheon's gray radomes be subjected to identical PLI tests." Vantage's proposal had recommended that Derby City perform the necessary structural testing. Raytheon conducted several other tests including the post-humidity RF tests on Vantage's gray radome, and reported that "the top of the Search Radome became soft where it contacted the floor of the Humidity Chamber. This caused indentations to the Radome's surface. The insertion loss in these areas failed at the highest test frequency from −0.1 to −0.3 dB. The maximum allowed insertion loss is −0.5 dB."

*The Solicitation*

The solicitation at issue in the case before the court was issued on March 11, 2002 and sought a contractor to manufacture Low Solar Absorbent (LSA) gray track radomes, pursuant to attached drawings. The Navy's solicitation listed two "qualified sources" for gray radomes, Vantage and Raytheon, and mentioned no other large or small business manufacturers.[2] Both of the qualified sources were required to pass detailed PLI qualification testing. Raytheon also prepared and issued new drawings and new part numbers for the gray gel coat for the gray radomes. The solicitation called for the submission of a technical narrative, not to exceed ten pages, in which the offeror "should include previous contracts of similar items."

The solicitation outlined five technical factors the Navy would use to evaluate the proposals: 1) Technical Capability; 2) Past Performance; 3) Production Capability; 4) Test Equipment; and 5) Quality Control System. The solicitation provided that the Navy would evaluate Past Performance on, among other things, the degree to which the offeror has satisfied its customers. The solicitation also explained the relationship between the technical scoring and price as follows:

> All evaluation factors other than price, when combined, are significantly more important than price. However, the importance of price as an evaluation factor will increase with the degree of equality in the proposals in relationship to the technical scores. After evaluation of the Technical Proposals and price, price may be the deciding factor between two or more highly rated Technical Proposals.[3]

On March 12, 2002, the Navy issued an amendment to the solicitation that further

---

2. A third company, Radant, also submitted a proposal, but the Navy ranked Radant third in the competition for receiving the lowest technical score and offering the highest price.

3. The Navy's initial Source Selection Plan (SSP), however, provided that "[f]or purposes of the Government's best value tradeoff, Price is significantly more important than Technical and Past Performance."

described the evaluation of the five technical requirements in relation to price:

> Offeror's proposal will be evaluated on the basis of Technical and Price. Technical evaluation will be based on five factors:
>
> 1. Technical Capability
> 2. Past Performance
> 3. Production Capability
> 4. Test Equipment
> 5. Quality Control System
>
> Factors (2) and (3) are equal in importance and are more important than factor (1). Factors (4) and (5) are equal in importance and are less important than factor (1). The five (5) factors when combined are significantly more important than price.

The modified October, 2002 Source Selection Plan (SSP), the SSP at issue in this case, provided that technical subcategories were to receive an adjectival rating guideline of either "Outstanding," "Good," "Satisfactory," or "Unsatisfactory."

*The Proposals*

On April 19, 2002, Raytheon submitted its proposal to the Navy and included a ten page technical narrative. The narrative stated that "Raytheon's existing Phalanx Radome manufacturing processes ... have been used to produce more than one thousand Search and Track Radomes over a twenty-four year period. The manufacturing processes will be slightly modified to incorporate the gray color." Raytheon also stated that "[t]he changes required to switch from white to gray are minimal.... Essentially the Radomes will be fabricated, tested and assembled the same." The narrative also stated that Raytheon had delivered radomes "to the United States, and over twenty allied Navies through both government and direct sales contracts. Deliveries have been made over a twenty four-year [sic] production period beginning with fiscal year 1978. Search and Track Radomes have been delivered with eight hundred and forty seven weapon systems."

On April 23, 2002, Vantage submitted its proposal to the Navy, along with its own technical narrative. Like Raytheon's narrative, Vantage's narrative described the switch from the older white radome production to the new gray radome production as "easily adapted to the current LSA requirement by simply substituting a properly pigmented gel-coat to achieve low solar loading with no compromise of existing electrical, structural and environmental performance." Vantage's proposal also stated that "the economics of using existing and proven test fixtures offsets the expense of shipping test articles," and that "[a]ll equipment [for RF testing] has been used in previous PHALANX radome production."

Vantage noted in its proposal that it had fabricated and delivered 578 (546 white and 32 gray) PHALANX search and track radomes to the Navy since 1985. Under "Past Performance," Vantage's proposal stated that "Vantage has produced [search and track radomes] since 1985 and probably has manufactured more search radomes than any other organization.... Vantage has delivered 525 search radomes and 53 track radomes. While the majority of these are white, 32 units have used precisely the LSA gel-coats and paints required by the current specification." Elsewhere, Vantage states that it produced "in excess of 600 search and track units ...." Vantage then proceeded to list two pages of contracts for the past production of radomes. Of the twenty-eight listed contracts, twenty-four contracts involved Vantage's manufacture of white radomes.

On June 13, 2002, the Navy awarded Raytheon the contract for gray radome production. A letter dated June 13, 2002 notified Vantage that "[a]ward was made to the low, technically acceptable offeror."

*The First GAO Protest*

On June 27, 2002, Vantage submitted its first protest to the General Accounting Office (GAO), questioning whether the Navy's technical evaluation was reasonable and in conformance with solicitation requirements. Vantage argued that although the RFP stated that "the technical factor was 'significantly more important' than price," the contract was awarded to the "low, *technically acceptable* offeror." (Emphasis in original.) Vantage also argued in the first GAO protest that, "[i]f a reasonable technical evaluation had been performed. Vantage would have

been rated significantly higher in the controlling technical factors of the procurement and would have rightly been determined to offer the best value to the Navy." Vantage stated that Raytheon had "fabricated far fewer radomes generally and only one or two gray radomes specifically," and had been "proven incapable of making even one gray radome that complies with specifications." Vantage also argued that its low score on the Test Equipment factor, because Vantage intended to subcontract certain tests efforts, "was irrational," since there was no requirement to own test equipment or perform a company's own tests. After reviewing the protest and supporting documentation, on July 10, 2002, the Navy determined that it would take corrective action to resolve the protest. On July 12, 2002, the GAO accepted the Navy's plan to perform a technical reevaluation of the Vantage and Raytheon proposals and dismissed the protest.

On September 2, 2002, the Navy completed a new technical evaluation and provided a summary report of the evaluation. The Navy found, after reviewing the new evaluation, that the evaluation criteria used by the source selection board still did not follow the evaluation criteria of the solicitation. The source selection board had again used criteria in the initial SSP that stated, "[f]or purposes of the Government's best value trade-off, Price is significantly more important than Technical and Past Performance." Therefore, the Contracting Officer (CO) revised the evaluation criteria in the SSP to match the evaluation criteria identified in the solicitation, which stated that the technical factors are more important than price.

On October 7, 2002, the Navy completed a second reevaluation that reviewed the offerors' proposals according to the relationships between price and technical factors found in the solicitation, rather than the directions found in the initial SSP. A modified SSP, which accompanied the second reevaluation materials dated October 3, 2002, stated the following:

The Offeror's proposal will be evaluated in accordance with the factors identified in Section M of the solicitation. The source selection will be based on these evaluation factors: Technical Capability, Past Performance, Production Capability, Test Equipment, Quality System and Price. All evaluation factors other than price, when combined, are significantly more important than price. However, the importance of price as an evaluation factor will increase with the degree of equality of proposals in relationship to the technical scores. After evaluation of the Technical Proposal and price, price may be the deciding factor between two or more highly rated Technical Proposals.

The second reevaluation weighed each of the five technical factors according to the adjectival rating guidelines and scored Vantage and Raytheon as follows:

| | | Raytheon | Vantage |
|---|---|---|---|
| 1. | Technical Capability | Outstanding | Good [4] |
| 2. | Past Performance [5] | Outstanding | Outstanding |
| 3. | Production Capability | Good | Outstanding |
| 4. | Test Equipment | Outstanding | Good |
| 5. | Quality Control System | Outstanding | Good |
| | Overall Technical Score | Outstanding | Outstanding |

In the second reevaluation, the Navy source selection board explained its decision to rate both Vantage and Raytheon with overall technical scores of "Outstanding" as follows:

Raytheon received an "Outstanding" rating in four out of five categories. The consensus of the board members was to give Raytheon an overall rating of Outstanding. As stated in the SSP, Past Performance and Production Capability are equal in importance and are more important than

---

4. The Navy noted that, according to the Raytheon report of Derby City Engineering's tests, Vantage's "Gray Search Radome failed the pull test" and concluded that the deficiency resulted in Vantage's technical capability score of "Good."

5. The past performances of Vantage and Raytheon were reevaluated during the second reevaluation on, among other things, white radomes. The Navy's summary stated that Raytheon had produced more than 1,000 white radomes and had generated the new drawings for the gray radomes. In reevaluating Vantage, the Navy considered its "excellent past performance for capability, efficiency, and effectiveness" involving Vantage's production of 600 white radomes, in addition to evaluating Vantage's smaller production of gray radomes. The Navy's reevaluation of Raytheon and Vantage, therefore, rated both as "Outstanding" for Past Performance.

Technical Capability. Even though the board members rated [Raytheon's] Production Capability as "Good", they believe the "Outstanding" ratings in Technical Capability, Past Performance, Test Equipment and Quality Control System warrant an overall rating of "Outstanding".

Vantage received an "Outstanding" rating in two out of five categories. The consensus of the board members was to give Vantage an overall rating of "Good", however, the Source Selection Plan states that Past Performance and Production Capability are equal in importance and are more important than Technical Capability. The SSP also states that Technical Capability is more important than Test Equipment and Quality Control. Based on the SSP, the Board members decided on an overall rating of "Outstanding".

On November 1, 2002, the Navy announced that Raytheon would again receive the contract award. Because Vantage and Raytheon were technically equal, price became the determining factor in awarding the contract, and Raytheon provided the lower cost proposal.

*The Second GAO Protest*

Vantage filed its second protest with the GAO on November 12, 2002, questioning the propriety of the second technical reevaluation, and asserting that the agency improperly had conducted a pure price competition. *Vantage Assocs., Inc.*, B–290802.2, 2003 CPD ¶ 32, at 3, 2003 WL 294376 (Comp.Gen. Feb. 3, 2003). In addition to the issues raised during the first GAO protest, in the second GAO protest Vantage argued that, "in Past Performance and Production Capability, in the second most important categories, Raytheon could not rationally have received anything other than 'Unsatisfactory.' That is because there is positive irrefutable proof that Raytheon's gray radome was totally non-compliant and that the front-line user of the system wanted it destroyed." Vantage also argued that the Navy incorrectly used white radomes to evaluate Raytheon's Past Performance, which "was unreasonable in

view of the RFP's emphasis on the very unique nature of gray radomes as requiring a higher or at least different skill level." [6]

The GAO denied Vantage's protest on February 3, 2003. The GAO wrote:

Nothing in the solicitation overall, or more particularly in the evaluation criteria substantiates Vantage's allegation that production of white Phalanx radomes was not relevant, or that production of gray radomes was a prerequisite to receiving a favorable evaluation.

Thus, while the protestor insists that the evaluation of past performance should be limited to consideration of the production of gray radomes, the RFP simply does not contain any such limitation.

*Vantage Assocs., Inc.*, 2003 CPD ¶ 32, at 5, 2003 WL 294376. The GAO also found that Vantage had supplied no meaningful evidence that Raytheon had produced a defective gray radome, and "Vantage's speculation regarding the origin of this noncompliant unit provides no basis for our Office to find that the agency [the Navy] was required to downgrade Raytheon's technical proposal." *Id.* at 6. Finally, the GAO dismissed Vantage's claim that Raytheon should have been assessed "Unsatisfactory" rather than "Good" under the Production Capability factor because "none of the RFP evaluation criteria require that an offeror have produced gray radomes in order to receive a favorable evaluation." *Id.* at 7, 2003 WL 294376. Following the dismissal, Vantage filed a complaint in this court on February 19, 2003. The parties submitted briefs to the court in accordance with a schedule agreed to by the parties.

Vantage and the Navy disagree, and the record is confusing as to whether, prior to the procurement at issue, Raytheon manufactured any defective gray radomes under contract. Vantage relies on December 23, 2002 Comments on the Agency Report prepared by Louis J. Alpinieri, Chairman and CEO of Vantage, and submitted to the GAO. According to Mr. Alpinieri, in December, 2001, he had "personally observed a gray radome

---

**6.** In the second GAO protest, Vantage argued for the first time that Raytheon had an unavoidable organizational conflict of interest (OCI) based on Raytheon's participation in designing and preparing the radome specifications. The GAO dismissed this claim on timeliness grounds.

manufactured by Raytheon which did not conform to Navy specification requirements." Mr. Alpinieri stated that Vantage received a defective gray radome from the Navy shipyard installer that lacked Vantage's identification code, but, in his opinion, matched Raytheon's design profile. In a declaration filed with the court on March 20, 2003, Mr. Alpinieri described a February 25, 2003 conversation that he stated had occurred with Dr. Robert Brady, a retired scientist formerly employed by the Naval Research Laboratory, Coating Research Division. Mr. Alpinieri alleges in the declaration that Dr. Brady initiated the purchase of two sets of gray radomes from Raytheon for research purposes. According to Mr. Alpinieri, one set was delivered to Litton Ship Systems in Mississippi, and the other to Bath Iron Works in Maine. The administrative record also contains an e-mail to Mr. Alpinieri dated February 24, 2002, in which the Navy instructed Vantage to destroy a defective gray radome in Vantage's possession.

In response, defendant cites a March 31, 2003 declaration signed by Lloyd E. Zurbrick, Jr., a Raytheon employee and the contracts manager for the PHALANX program. Mr. Zurbrick indicated that, "[o]ther than the contract at issue in this protest, Raytheon has never contracted with the Navy, or any other entity for that matter, to produce gray radomes for fleet use." Mr. Zurbrick also notes, however, that "there were two occasions where Raytheon was contracted to test the effects of changing the color of the radomes from white to gray." According to Mr. Zurbrick's declaration, in 1996, "Raytheon assisted the Naval Research Laboratory ... to fabricate and test one set of gray gel coat radomes. These radomes were installed on an engineering mount located at Raytheon's Tucson facility and remain on that mount to this date." Also, in 1998, Mr. Zurbrick states in his declaration that, "Bath Iron Works contracted with Raytheon to assist in painting existing white radomes on the USS Donald Cook (DDG 75) with Gray LSA paint and instrument those radomes for testing purposes." Mr. Zurbrick maintains that "[o]ther than the two sets of gray radomes described herein, and other than the gray radomes being produced pursuant to [the]

contract [at issue], Raytheon ... has never produced any other gray radomes."

## DISCUSSION

### Injunctive Relief

Plaintiff requests injunctive relief based on allegations of government errors during the evaluation of the proposals received on the gray radome solicitation. Courts should interfere with the government procurement process "only in extremely limited circumstances." *Banknote Corp. of America, Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d at 1372)); *see also ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. 57, 64 (2001) (emphasizing that injunctive relief is not routinely granted) (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence. *Bannum, Inc. v. United States*, 56 Fed.Cl. 453, 457 (2003) (quoting *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991)); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 566 (2000); *Delbert Wheeler Constr., Inc. v. United States*, 39 Fed.Cl. 239, 251 (1997), *aff'd*, 155 F.3d 566 (Fed.Cir.1998) (table); *Compliance Corp. v. United States*, 22 Cl.Ct. 193, 206 & n. 10 (1990), *aff'd*, 960 F.2d 157 (1992) (table); *but see Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1378 & n. 6 (1992). The decision on whether or not to grant an injunction is within the sound discretion of the trial court. *See FMC Corp. v. United States*, 3 F.3d at 427; *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1578 (Fed.Cir. 1990). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." *FMC Corp. v. United States*, 3 F.3d at 427.

To obtain a temporary restraining order or preliminary injunction, the plaintiff

must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

> (1) the likelihood of plaintiff's success on the merits of its complaint; (2) whether plaintiff will suffer irreparable harm if the procurement is not enjoined; (3) whether the balance of hardships tips in the plaintiff's favor; and (4) whether a preliminary injunction will be contrary to the public interest.

*ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999) (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523–24 (2003); *OAO Corp. v. United States,* 49 Fed.Cl. 478, 480 (2001) (" 'When deciding if a TRO is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction.' ") (quoting *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 647 (1997)); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 614, 616 (2001). The United States Court of Appeals for the Federal Circuit, in *FMC Corporation v. United States,* noted that:

> No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States,* 3 F.3d at 427 (citations omitted).

The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires success on the merits. The court in *Bean Stuyvesant, L.L.C. v. United States* set out the test:

> (1) [A]ctual success on the merits; (2) that [plaintiff] will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction serves the public interest.

*Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. at 320–21 (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000), *aff'd,* 10 Fed.Appx. 957 (Fed.Cir.2001)); *see also ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997) (" 'The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' ") (quoting *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

Plaintiff's original complaint appeared to seek either a preliminary or permanent injunction. In a hearing on February 21, 2003, however, plaintiff's counsel confirmed with the court that a proper application for a preliminary injunction had not been filed with the court and that counsel needed to consult with his client on whether to seek preliminary injunctive relief. Plaintiff never applied for a preliminary injunction. Plaintiff's subsequent motion for judgment on the administrative record, however, requested permanent injunctive relief.

The plaintiff claims that irreparable injury in this case is established by the lost "opportunity to compete fairly for and to perform work under the contract, and also [the lost] profits that would be generated by the contract," quoting *Metcalf Constr. Co., v. United States,* 53 Fed.Cl. 617, 645 (2002) (citing *Day & Zimmermann Servs., A Division of Day & Zimmermann, Inc. v. United States,* 38 Fed. Cl. 591, 610 (1997)); *see also United Payors & United Providers Health Servs., Inc., v. United States,* 55 Fed.Cl. 323, 333 (2003) (citing *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998) ("[L]ost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.")); *Labat–Anderson Inc., v. United States,* 50 Fed. Cl. 99, 110 (2001) ("Lost profits and a lost opportunity to compete constitute irreparable injury."). Plaintiff claims that the instant procurement likely will be the vehicle for

buying all radomes purchased by the Navy for the next four years. Although plaintiff makes an unsupported assertion that it "will be out of the PHALANX radome business" if a permanent injunction is not awarded, as discussed below, plaintiff has not demonstrated that it lost a contract to which it is entitled.

Plaintiff also argues that the harm it will suffer if injunctive relief is not granted far outweighs any detriment to defendant. Plaintiff minimizes the harm to defendant and claims that the Navy's "pre-award estimate was essentially identical to Plaintiff's price and thus Defendant will not spend more than it planned." Plaintiff further asserts that "there will be no delays whatsoever" if plaintiff is awarded the contract. Finally, plaintiff repeats the warning that it "will be out of the PHALANX radome business" if relief is not granted. Defendant counters that "[d]elaying procurement of the gray radomes any more than has already occurred will adversely affect military preparedness, the safety of Navy, and the national defense."

The Tucker Act states that the court must "give due regard to the interests of national security." 28 U.S.C. § 1491(b)(3) (2002). A solicitation that addresses military preparedness concerns implicates interests of national defense. *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 237, 241–42 (1997). Defendant argues that a further delay in this gray radome procurement would raise national defense concerns, and would "clearly place the weight of the balance-of-harms factor on defendant's scale," quoting *Aero Corp., S.A. v. United States,* 38 Fed.Cl. at 241–42; *see also Cincom Sys., Inc. v. United States,* 37 Fed. Cl. 266, 269 (1997); *Rockwell Int'l Corp. v. United States,* 4 Cl.Ct. 1, 6 (1983) (indicating that requests for injunctive relief should receive greater scrutiny when protests involve national defense and national security); *Southwest Marine Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983). Even plaintiff acknowledges that the Navy's rationale for changing the color of radomes was that the white radomes were essentially an aiming point or target for hostile aircraft and missiles. In the instant procurement, Ray-

theon's production of gray radomes has already been stayed twice since the original contract award on June 13, 2002. Furthermore, plaintiff did not file an application for a temporary restraining order or preliminary injunction at the outset of the case. Even if national security and defense are not immediately threatened by further delay, injunctive relief is improper in this case because the harm to plaintiff does not outweigh "the harm to the Government and third parties." *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. at 320 (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. at 582).

Plaintiff also asserts that the public interest would be served by granting injunctive relief. Specifically, plaintiff maintains that granting relief will ensure that RFPs are awarded in accordance with the general provisions of federal procurement law and the terms stated in the solicitation. Additionally, plaintiff argues that the public has an interest in enhancing the opportunities and participation of small businesses, and that plaintiff offers a product "at least as good if not better than" the product offered by Raytheon.

The court agrees that abuse of discretion by an agency in evaluating bid proposals compromises the public interest in honest, open, and fair competition in the procurement process. *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000); *see also Cincom Systems, Inc. v. United States,* 37 Fed.Cl. at 269. "Moreover, 'a public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations.'" *Overstreet Elec. Co. v. United States,* 47 Fed.Cl. at 744 (quoting *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d at 866–67). "The public has an interest in honest, open and fair competition, and if plaintiff is improperly excluded, that interest is compromised.... On the other hand, the legislative history to the court's injunction statute indicates that Congress felt that the government should be able to conduct procurements expeditiously and with as little judicial intrusion as possible into the government's discretion." *Magellan Corp. v. United States,* 27 Fed.Cl. 446, 448 (1993); *see also Overstreet Elec. Co. v. United States,* 47 Fed.

Cl. at 744; *Aero Corp., S.A. v. United States,* 38 Fed.Cl. at 241–42; *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. at 269. As dis-cussed below, the plaintiff does not succeed on the merits before this court. The contracting officials did not violate the procurement rules or abuse their discretion. Injunctive relief, therefore, is not warranted.

*Organizational Conflicts of Interest*

██ In this court, plaintiff contends that the awardee, Raytheon, possessed an organizational conflict of interest (OCI). Therefore, plaintiff requests Raytheon's contract be terminated and Vantage be awarded the contract. "A conflict of interest exists when the contractor's objectivity may be impaired due to the nature of the work to be performed." *Informatics Corp. v. United States,* 40 Fed.Cl. 508, 513 (1998) (quoting *KPMG Peat Marwick,* B–255224, 94–1 CPD ¶ 111, 1994 WL 53729 (Comp.Gen. Feb. 15, 1994)). Under Federal Acquisition Regulations (FAR) 9.505, OCIs are grouped into three categories. The first group of OCIs consists of situations in which a firm has set the ground rules to some degree for another government contract, for example, by providing systems engineering and technical direction or preparing specifications or work statements to be used in a competitive acquisition. 48 C.F.R. §§ 9.505–1, 9.505–2 (2002); *see, e.g., Aetna Gov't Health Plans, Inc.,* B–254397, 1995 WL 449806, at *8 (Comp.Gen. July 27, 1995). The second group of OCIs includes situations in which a government contract could entail a firm evaluating itself or a competitor without proper safeguards, either by assessing performance under another contract or by evaluating proposals for the contract at issue. 48 C.F.R. § 9.505–3 (2002); *see, e.g., Aetna Gov't Health Plans, Inc.,* 1995 WL 449806, at *9. The third group of OCIs consists of situations in which a firm has access to proprietary information as part of performing a government contract that may provide a competitive advantage for future government contracts, unless restrictions are imposed. 48 C.F.R. § 9.505–4 (2002); *see, e.g., Aetna Gov't Health Plans, Inc.,* 1995 WL 449806, at *8. The FAR advises contracting officers, with whom rests the responsibility of determining whether a conflict will arise, "to examine each situation individually and to exercise 'common sense, good judgment, and sound discretion' in assessing whether a significant potential conflict exists and in developing an appropriate way to resolve it." *Aetna Gov't Health Plans, Inc.,* 1995 WL 449806, at *8 (quoting 48 C.F.R. § 9.505).[7]

Plaintiff contends that, according to FAR 9.505, Raytheon has an OCI with respect to the gray radome procurement. Plaintiff alleges that an organizational conflict of interest arose because Raytheon prepared the new specifications for the gray radome procurement and then competed in the same procurement. Plaintiff cites FAR 9.505–2, which governs contractors that prepare specifications or work statements.[8] Plaintiff

---

7. Conflicts may arise in situations not expressly covered in this section 9.505 or in the examples in 9.508. Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it.

   48 C.F.R. § 9.505.

8. The particular sections of the FAR cited by plaintiff are as follows:

   If a contractor prepares and furnishes complete specifications covering nondevelopment items, to be used in a competitive acquisition, that contractor shall not be allowed to furnish these items, either as a prime contractor or as a subcontractor, for a reasonable period of time including, at least, the duration of the initial production contract. This rule shall not apply to—(i) Contractors that furnish at Government request specifications or data regarding a product they provide, even though the specifications or data may have been paid for separately or in the price of the product; or (ii) Situations in which contractors, acting as industry representatives, help Government agencies prepare, refine, or coordinate specifications, regardless of source, provided this assistance is supervised and controlled by Government representatives.

   48 C.F.R. § 9.505–2(a)(1).

   If a contractor prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services—or provides material leading directly, predictably, and without delay to such a work statement—that contractor may not supply this system, major components of this system, or the services unless—(i) It is the sole source; (ii) It has

states further that, "[a]lthough none of the examples at 9.508 cover this case exactly, 9.508(e) comes close." FAR 9.508(e) provides that:

Before an acquisition for information technology is conducted, Company A is awarded a contract to prepare data systems specifications and equipment performance criteria to be used as the basis for selection of commercial hardware, a potential conflict of interest exists. Company A should be excluded from the initial follow-on information technology hardware acquisition.

48 C.F.R. § 9.508(e) (2002).

Defendant responds that Raytheon, as the manufacturer and designer of the entire PHALANX system, including radomes, is exempt from the OCI regulations at issue. Defendant refers to the following language of the FAR:

A contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production shall not (1) be awarded a contract to supply the system or any of its major components or (2) be a subcontractor or consultant to a supplier of the system or any of its major components.

48 C.F.R. § 9.505–1(a). Therefore, according to the defendant, as an entity with the overall contractual responsibility for the PHALANX program, Raytheon is not precluded from bidding on a production contract even after providing the specifications. *See* 48 C.F.R. § 9.505–1(a). Defendant also cites an example, in FAR 9.508(c), which provides that: "Company A develops new electronic equipment and, as a result of this development, prepares specifications. Company A may supply the equipment." 48 C.F.R. § 9.508(c) (2002). Defendant concludes that "Raytheon, as the designer, developer, integrator, and only producer of the PHALANX system fits within the well-articulated exceptions and is not precluded from bidding upon

participated in the development and design work; or (iii) More than one contractor has been involved in preparing the work statement.

and being a[sic] awarded a contract to build the radomes that it designed."

Plaintiff, however, contends that "General Dynamics, not Raytheon ... was the 'overall' systems designer," because Raytheon purchased PHALANX related assets, rather than "purchased or merged" with former PHALANX contractors Hughes or General Dynamics. Plaintiff also claims that "Raytheon is, in essence, the 'caretaker' of the PHALANX system, and nothing more." Plaintiff's argument presupposes that only the original developmental PHALANX contractor, General Dynamics, could possess overall developmental contractual responsibility, rather than Raytheon, the direct PHALANX successor of General Dynamics. Plaintiff's argument carried to its ultimate conclusion suggests that even a corporate name change by a developmental contractor could negate the exception found in FAR 9.505–1. Plaintiff's argument would mean that the rules and purpose behind those rules for developmental contractors would expire when a system transferred to a successor corporate entity, even if development and design continued under the successor. No such constraints are found in the OCI rules. Raytheon fits within the exceptions in FAR 9.505–1 for development and design contractors. Raytheon had and continues to have overall contractual responsibility for the PHALANX system's development, integration, assembly, checkout, and production. *See* 48 C.F.R. § 9.505–1(a); *see also* 48 C.F.R. §§ 9.505–2(a)(3), 9.505–2(b)(1)(ii), 9.505–2(b)(3). The FAR explains the rationale for allowing contractors, like Raytheon, to be awarded such contracts:

In development work, it is normal to select firms that have done the most advanced work in the field. These firms can be expected to design and develop around their own prior knowledge. Development contractors can frequently start production earlier and more knowledgeably than firms that did not participate in the development, and this can affect the time and quality of production, both of which are important to the Government. In many

48 C.F.R. § 9.505–2(b)(1).

instances the Government may have financed the development. Thus, while the development contractor has a competitive advantage, it is an unavoidable one that is not considered unfair; hence no prohibition should be imposed.

48 C.F.R. § 9.505–2(a)(3). Raytheon is the development and design contractor, and, as such, the FAR permits Raytheon's participation in the contract at issue.

■ Defendant also argues that the following FAR conflict of interest exception applies to Raytheon: "This rule [prohibiting bidding] shall not apply to(ii) Situations in which contractors, acting as industry representatives, help Government agencies prepare, refine, or coordinate specifications, regardless of source, provided this assistance is supervised and controlled by Government representatives." *See* 48 C.F.R. § 9.505–2(a)(1)(ii). The administrative record reflects that although Raytheon generated the gray radome drawings used for the instant procurement, it was the Navy PHALANX Program Office that approved the drawings. Raytheon's proposal explains that "[t]he Phalanx Radome drawing requirements were generated by Raytheon and approved by the Navy Phalanx Program Office." The Navy's second reevaluation of the proposals appropriately noted that Raytheon had "generated the new drawing for the LSA Gray Radomes (under their Design Agent contract) and they are currently producing the 'white' version of the Radome." Furthermore, the Pilot Lot Inspection (PLI) and testing of Vantage's gray search and track radome by Raytheon was authorized "on March 23, 2000 by the Navy Program Office." Raytheon, the development and design contractor for the PHALANX system, acting as an industry representative and under the Navy auspices, fits the exception to an organizational conflict of interest provided for in FAR 9.505–2(a)(1)(ii). *See* 48 C.F.R. 9.505–2(a)(ii) ("Situations in which contractors, acting as industry representatives, help Government agencies prepare, refine, or coordinate specifications, regardless of source, provided this assistance is supervised and controlled by Government representatives.").

Plaintiff also argues that "the key purpose of FAR Subpart 9.5[sic] is to avoid even the *appearance* of impropriety in Government procurements.... If not actually unfair ... Raytheon's participation and receipt of the contract where it wrote the specification and otherwise has at least a 'close' relationship with Defendant's procurement office, certainly *appears* to be unfair," citing to the principles in *Aetna Gov't Health Plans, Inc.*, 1995 WL 449806 (emphasis added by plaintiff). In *NKF Engineering, Inc.*, the United States Court of Appeals for the Federal Circuit deferred to the agency's conclusion that an appearance of impropriety existed. *NKF Eng'g. Inc. v. United States*, 805 F.2d 372, 376 (Fed.Cir.1986); *see also Compliance Corp. v. United States*, 22 Cl.Ct. 193, 205 (1990) ("[T]he contracting officer has appropriate authority to disqualify a bidder based solely on the appearance of impropriety when, in his honest judgment, it is necessary to do so to protect the integrity of the procurement process."), *aff'd*, 960 F.2d 157 (Fed. Cir.1992). The Federal Circuit also stated in *NKF Engineering, Inc.* that "[t]he Claims Court should be allowed to enjoin the agency from awarding contracts, and thereby to interfere with the procurement process, 'only in extremely limited circumstances.'" *NKF Eng'g. Inc. v. United States*, 805 F.2d at 376 (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d at 1581 (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983))). Furthermore, the case plaintiff relies on, *Aetna Government Health Plans*, states that "[t]he responsibility for determining whether an actual or apparent conflict of interest will arise, and to what extent the firm should be excluded from the competition, rests with the contracting agency." *Aetna Gov't Health Plans, Inc.*, 1995 WL 449806, at *8 (citing *SRS Technologies*, B–258170.3, 95–1 CPD ¶ 95, 1995 WL 75807 (Comp.Gen. Feb. 21, 1995)). Given that both the developmental contractor and industry representative exceptions in the FAR's OCI rules apply to Raytheon, and given the deferential standard of review on the OCI issue, the court cannot say that the Navy acted unreasonably when it included Raytheon in the gray radome production competition and

concluded that no actual or apparent conflict of interest existed.

*Motion for Judgment on the Administrative Record*

The plaintiff has filed a motion for judgment on the administrative record, and defendant has filed a cross motion for judgment on the administrative record, pursuant to Rule 56.1 of the Rules of the Court of Federal Claims (RCFC). RCFC 56.1(a) incorporates the summary judgment standards in RCFC 56(a)-(b), "with the exception that any supplementation of the administrative record shall be by stipulation or by court order." RCFC 56.1(a); *see also ABF Freight System, Inc. v. United States,* 55 Fed.Cl. 392, 395 (2003); *Rust Constructors Inc. v. United States,* 49 Fed.Cl. 490, 493 (2001); *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997) (table). In the present case, plaintiff requested to supplement the administrative record with a declaration signed by Louis J. Alpinieri, Chairman and CEO of Vantage, in an attempt to demonstrate that Raytheon had produced a defective gray radome prior to the procurement at issue. Parties may supplement the administrative record in certain limited situations to "preserve a meaningful judicial review." *North Carolina Div. of Servs. for the Blind v. United States,* 53 Fed.Cl. 147, 158 (2002), *aff'd,* 60 Fed.Appx. 826 (Fed.Cir.2003) (quoting *Rust Constructors Inc. v. United States,* 49 Fed.Cl. at 496 (quoting *SDS Int'l v. United States,* 48 Fed. Cl. 759, 766 (2001) and *Cubic Applications Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997))); *see also Aero Corp., S.A. v. United States,* 38 Fed.Cl. 408, 411 (1997). Specifically, courts may consider "extra-record" evidence:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. at 342 (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)); *see also North Carolina Div. of Servs., for the Blind v. United States,* 53 Fed.Cl. at 158; *Marine Hydraulics Int'l. Inc. v. United States,* 43 Fed.Cl. 664, 670 (1999); *Aero Corp., S.A. v. United States,* 38 Fed.Cl. at 411.

On March 13, 2003, the court permitted plaintiff to file the Alpinieri declaration, citing *North Carolina Div. of Servs. for the Blind v. United States,* 53 Fed.Cl. at 158 (citing the factors collected in *Esch v. Yeutter,* 876 F.2d at 991):

The proposed declaration tendered by plaintiff may be relevant to pertinent issues in this post-award bid protest; may shed light on agency actions not adequately explained in the record presently before the court; may assist the court in determining whether or not the agency considered factors relevant to its final decision; may assist the court to understand the issues more clearly; may assist the court in determining whether or not the agency action was correct; and may assist in the review of plaintiff's request for injunctive relief.

The court also informed the parties that the "[f]ull relevance, probity and credibility of the proposed supplementation will be assessed during review of all the parties' submissions."

RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Allergan, Inc. v. Alcon Lab., Inc.*, 324 F.3d 1322, 1329 (Fed.Cir.) *reh'g en banc denied* (2003); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States*, 49 Fed.Cl. 648, 651 (2001), *aff'd*, 52 Fed.Appx. 507 (Fed.Cir.2002); *Becho, Inc. v. United States*, 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.*, 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States*, 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds*, 970 F.2d 890 (Fed.Cir.1992); *see also United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1368 (Fed.Cir.2002); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Crater Corp. v. Lucent Tech., Inc.,* 255 F.3d 1361, 1366 (Fed.Cir.), *reh'g denied* (2001), *cert. denied,* 535 U.S. 1073, 122 S.Ct. 1952, 152 L.Ed.2d 854 (2002); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l. Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Crater Corp. v. Lucent Tech., Inc.,* 255 F.3d at 1366; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed.Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir.2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *see also Transclean Corp. v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1369 (Fed.Cir.), *reh'g denied* (2002); *McKay v. United States,* 199 F.3d 1376, 1380 (Fed.Cir.1999) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d at 1390); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion; each must be independently assessed on its own merit." *California v. United States,* 271 F.3d 1377, 1380 (Fed.Cir.2001) (citing *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1364 (Fed.Cir.2001)); *see also Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002); *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001). In the case before the court, after reviewing the parties' supplemental submissions, the court finds that there are no material facts in dispute.

Vantage requests a permanent injunction against Raytheon seeking various forms of relief. In addition to its OCI claim, Vantage challenges the Navy's evaluation as faulty and seeks either 1) that plaintiff be awarded the contract, 2) that the court enjoin Raytheon from continued performance of the contract pending a new competition on a sealed-bid basis from qualified gray radome

sources, or 3) that the court enjoin Raytheon from continued performance and direct a new procurement "without regard to 'qualified' status and on the basis of technical and cost factors." Plaintiff also asks for proposal preparation costs, attorney's fees in accordance with the Equal Access to Justice Act, and costs.

*Standard of Review*

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. *See* 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.), *reh'g and reh'g en banc denied* (2003); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001).

Agency procurement actions should be set aside when they are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "(D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2000).[9] In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit has dis-

cussed specifically subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332 n. 5; *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001) ("The APA provides that a reviewing court must set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (Supp. V 1999)."); *RAMCOR Servs. Group. Inc. v. United States*, 185 F.3d 1286, 1290 (Fed.Cir.1999).

In *Impresa Construzioni Geom. Domenico Garufi v. United States*, the court wrote:

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure .... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a co-

9. The full language of section 706 of the APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706 (2000).

herent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [(D.C.Cir.1973)]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

■ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. at 106; *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed. Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. at 619; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999). The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision .... The reviewing court is thus enabled to perform a meaningful review ....").

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto., Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. at 523 (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971))). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *In re Sang–Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.), *reh'g denied* (2000) ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citing *Bowman Transp., Inc.*

v. *Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed. Cir.1993); *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. at 63; *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them.") (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 231 (1997); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 154 (1997); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 663 at 672 (1997); *Commercial Energies, Inc. v. United States,* 20 Cl.Ct. 140, 145 (1990) ("In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably.") (citations omitted).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); *cf. Widnall v. B3H,* 75 F.3d 1577 (Fed. Cir.1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3[, 1994 WL 129008] (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (cita-

tions omitted). Bliss has not shown that the Mint abused its discretion in awarding the contract to Pressmasters.

\* \* \* \* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") ....

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement ...." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977)): *see also Am. Tel. and Tel. Co. v. United States,* 307 F.3d 1374, 1379 (Fed.Cir. 2002), *reh'g en banc denied.* (2003); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d at 958; *Cybertech Group, Inc. v. United States,* 48 Fed.Cl. at 646 ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."). In *Burroughs Corp. v. United States,* the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

> Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a

judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising. *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); *see also La-Barge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995); *JWK Int'l Corp. v. United States*, 49 Fed.Cl. at 388; *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit has also stated that:

> Effective contracting demands broad discretion. *Burroughs Corp. v. United States*, [223 Ct.Cl. 53,] 617 F.2d 590, 598 (Ct.Cl.1980); *Sperry Flight Sys. Div. v. United States*, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); *see NKF Eng'g. Inc. v. United States*, 805 F.2d 372, 377 (Fed.Cir. 1986); *Tidewater Management Servs., Inc. v. United States*, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States*, 17 Cl.Ct. 812, 819 (1989), *aff'd*, 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." *Tidewater Management Servs.*, 573 F.2d at 73, 216 Ct.Cl. 69 ....

*Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d at 958–59; *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d at 995; *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994).

■ The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. As stated by the United States Supreme Court:

> Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on "engineering and scientific" considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Fed. Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972); *see also Compubahn v. United States*, 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985) (Especially "where an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper.") (citations omitted). As noted above, the question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but rather, whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary or capricious.

■ To prevail in a bid protest case, the protester also must demonstrate prejudice. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Expanding on the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General*, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567,

1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award-that it was within the zone of active consideration.' ") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (1999) (citation omitted in original); *see also Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000). In *Data General Corporation v. Johnson,* the Circuit Court wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract .... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

In the present case, plaintiff Vantage asserts that the Navy arbitrarily and capriciously awarded Raytheon the contract for gray radomes because the Navy failed to evaluate the quality and nature of Raytheon's past production of gray, rather than white, PHALANX radomes. Additionally, Vantage claims that the Navy failed to give proper weight to Vantage's experience with gray PHALANX radomes, and unfairly downgraded Vantage's gray search radome based on competitor Raytheon's critique. Vantage asserts that the Navy ultimately awarded the contract based on low price, rather than technical merit, contrary to the solicitation and the requirements of FAR 15.305(a), concerning bid proposal evaluations. Defendant moves for judgment on the administrative record, contending that the challenged agency action was not arbitrary, capricious, an abuse of discretion, and was in accordance with law.

*Technical Evaluation*

Plaintiff maintains that the Navy should have evaluated offers on the basis of past experience in gray radome production. Plaintiff asserts that Raytheon's proposal mentioned participation in developing the gray radome, and plaintiff offered information to the Navy's procurement office that Raytheon had made a seriously deficient gray radome. Plaintiff relies on the statements in the record of Louis J. Alpinieri, Chairman and CEO of Vantage, that in December, 2001 he had "personally observed a gray radome manufactured by Raytheon which did not conform to Navy specification requirements." Mr. Alpinieri explained that:

> On or about December 1, 2001 Mr. E. Schwartz of the AEGIS Program Office ... contacted me. He claimed that the shipyard installer was unable to seal one of the gray search radomes Vantage had delivered to NRL when it was placed on the PHALANX mounting surface.... We requested that the radome be returned for evaluation. On receipt, we examined it and found that it had no manufacturer's "CAGE" code; Vantage units all are clearly marked with our CAGE code 67351. Also, this unit had a visibly different profile than Vantage's design and it is typical of the Raytheon profile and could not have been produced on Vantage's tooling. Since I was personally aware by virtue of conversations with Dr. Brady at NRL that Raytheon had, in fact, made a few gray radomes, and based on the fact that there is essentially a zero possibility that anyone else could have made a gray PHALANX radome, since this is not a common item made by commercial sources or even other Government contractors. There is a 100%

certainty that it was produced by Raytheon.

In a declaration submitted to this court, supplementing his earlier statements, Mr. Alpinieri also described a February 25, 2003 conversation that he claims occurred with Dr. Robert Brady, a retired scientist formerly employed by the Naval Research Laboratory, Coating Research Division, who Mr. Alpinieri stated "was in charge of developing the gray coatings for the external metal and plastic/composite components of the PHALANX (CIWS) system." Mr. Alpinieri indicates that Dr. Brady stated that he had personally initiated the purchase of gray radomes from Raytheon in "about 1996 or 1997." Allegedly, one set of radomes was delivered to Litton Ship Systems, Pascagoula, Mississippi and the other set to Bath Iron Works in Maine. Mr. Alpinieri also indicated that "Dr. Brady said that to his recollection and personal knowledge, the Litton units were installed and tested at sea to validate that the gray color did not cause overheating or any other adverse effect to PHALANX radar performance ... [and] the set sent to Bath Iron Works was not used at that time."

Plaintiff asserts that Raytheon's alleged production of defective gray radomes should have been considered because gray radomes were the exact product being procured. Plaintiff argues that the Navy violated the FAR provisions governing Past Performance, because "although not all past performance information need be included in an evaluation, 'some information is simply too close at hand to ignore,'" quoting GTS Duratek, Inc., B–280511.2, 98–2 CPD ¶ 130, at 14, 1998 WL 840923 (Comp.Gen. Oct. 19, 1998); see 48 C.F.R. § 15.305(a)(2)(i), (ii) (2002). Plaintiff asserts that agencies have wide discretion to give more weight to one prior contract than to another, particularly when the heavily weighted contract is more relevant to future performance, citing Chant Engineering Co., B–280250, 98–2 CPD ¶ 38, at 4, 1998 WL 461076 (Comp.Gen. Aug. 7, 1998). The question to be decided, concludes plaintiff, "is whether the discretion given to an agency permits it to ignore totally such information, to the point of not even inquiring of an offeror regarding prior experience with the identical item being procured, and whether discretion permits rating the awardee superior to the competition only on the basis of a 'similar' item," the white radomes.

Defendant contends that the facts surrounding all of Mr. Alpinieri's statements should be disregarded because the statements are self-serving, unreliable, and baseless accusations and innuendos, and because the additional declaration should not have been admitted as a supplement to the record. Defendant claims that the FAR, the solicitation, the SSP, and the legal precedent cited by plaintiff "require the contracting officer to review past performance of contracts, not allegations of past non-contractual 'experience'." (Emphasis in original.) Defendant states that all of the case law cited by Vantage involves the analysis of prior contracts. Defendant highlights the following language in the FAR:

> The solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or *current contracts* (including Federal, state, and local government and private) for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the *identified contracts* and the offeror corrective actions.

48 C.F.R. § 15.305(a)(2)(ii) (emphasis added by defendant). Defendant also relies on the language of the solicitation that states technical narratives "should include *previous contracts* of similar items," and "past performance will be evaluated on the degree to which the Offeror has satisfied its customers." (Emphasis added by defendant.) Defendant notes that the language of the Navy's SSP, used in the second reevaluation after the first GAO protest was dismissed, states that "[t]he Offeror shall provide *contract numbers of past performance* for similar hardware. The Offeror should provide the quantity of hardware delivered, a description of the hardware, and the customer. Past performance will be evaluated on the degree to which the Offeror has satisfied its customers." (Emphasis added by defendant.)

Even with Mr. Alpinieri's declaration, the court cannot conclude from the record that Raytheon produced a defective gray radome. The record does not contain clear evidence that Raytheon produced a defective radome as part of a contract to produce gray radomes for fleet use, or that Raytheon produced a defective radome as part of a contract to test changing the color of radomes from gray to white. Although Mr. Zurbrick, the contracts manager of the PHALANX program for Raytheon, acknowledges that "Raytheon was contracted to test the effects of changing the color of the radomes from white to gray," it is not clear that the gray radome the Navy ordered Vantage to destroy in February, 2002 was a radome that Raytheon had produced. Moreover, even if a defective radome had been associated with Raytheon's testing effort, it is not clear to the court that information on testing or experimental contracts activity was required to be submitted by Raytheon and evaluated by the government as Past Performance in a solicitation for radome production intended for fleet use. The question is whether the Navy acted arbitrarily or capriciously by not obtaining and evaluating gray radome data from Raytheon.

■ Generally, "[a]n agency is accorded broad discretion when conducting its past performance evaluations." *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 319 (2002) (citing *SDS Int'l v. United States,* 48 Fed.Cl. 759, 771 (2001) (citing *Forestry Surveys & Data v. United States,* 44 Fed.Cl. 493, 499 (1999))). Moreover, "[a]gency personnel are generally given great discretion in determining what references to review in evaluating past performance." *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. at 567; *see SDS Int'l v. United States,* 48 Fed. Cl. at 771 (citing *Forestry Surveys & Data v. United States,* 44 Fed.Cl. at 499). Thus, for example, "an agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Forestry Surveys & Data v. United States,* 44 Fed.Cl. at 499. Moreover, "[t]here is no requirement that all references listed in a proposal be checked." *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. at

567 (citing *HLC Indus. Inc.,* B–274374, 96–2 CPD ¶ 214, at 7, 1996 WL 705198 (Comp. Gen. Dec. 6, 1996) and *Black & Veatch Special Projects Corp.,* B–279492.2, 98–1 CPD ¶ 173, 1998 WL 339687 (Comp. Gen. June 26, 1998)). "In light of this, various decisions hold that, in protests challenging an agency's evaluations of an offeror's technical proposal and past performance, review should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 659 (2002).

■ The FAR requires the Navy to evaluate the proposals, in this case for production of gray radomes, and assess their relative qualities "solely on the factors and subfactors specified in the solicitation." 48 C.F.R. § 15.305(a). The solicitation stated, under the subject heading "Submission of Past Performance Information":

Offerors shall submit the following information with their proposals:

1. Contract number(s) for current or previous contracts for the same or similar product(s).

2. Brief, but comprehensive description of the product delivered.

3. Technical point of contact(s) (Name, Address and Telephone Number).

4. Procuring Contracting Officer or Commercial Purchasing Manager (Name, Address and Telephone Number).

Please limit information to six (6) contracts.

The solicitation did not specify that offerors must submit information on past contracts for research or experimental testing. Furthermore, the solicitation contained no requirement on the part of the Navy to evaluate such data. Nor did the Navy commit prejudicial error in failing to ask bidders to submit experimental or testing data, when the procurement involved radome production in quantity for fleet use.

In this court, plaintiff maintains that the express terms of the RFP and the development and procurement background of gray

radomes establish that gray radomes are a substantively different product than white radomes. Plaintiff contends, therefore, that the contract award should have been made on the basis of Vantage's technical superiority regarding gray radomes. Plaintiff alleges five reasons it believes indicate that the solicitation clearly signaled differences between gray and white radomes. First, new drawings were used for the gray radomes. Second, plaintiff alleges that radomes had traditionally been procured using a sealed bid process, rather than a negotiated procurement. Third, Vantage and Raytheon were listed as the only "qualified sources" for production of the gray radomes. Fourth, plaintiff alleges that the procurement of gray radomes at issue was not set aside for small businesses as white radome procurements had been for many years. Fifth, plaintiff argues that "even the 'qualified' sources, [Vantage] and Raytheon, were required to conduct First Article Testing," that such a requirement indicates the importance of technical factors and signals a change in the manufacturing process. Plaintiff contends that the additional cost in its proposal ensured "that the gray gel coat was correct and thereby eliminate[s] any possibility that radomes made in accordance with the Navy's 'gray' specification might not work."

Both Vantage and Raytheon's contract proposals, submitted before any litigation arose, indicate that no significant technical differences exist between gray and white radomes. Vantage's proposal states that Vantage's PHALANX search and track radome "has been proven to be easily adapted to the current LSA [Low Solar Absorbency] requirement by simply substituting a properly pigmented gel-coat to achieve low solar loading with no compromise of existing electrical, structural and environmental performance." Vantage's proposal also states that "all equipment [for RF testing] has been used in previous PHALANX radome productions." Raytheon's proposal states that "[t]he changes required to switch from white to gray are minimal.... Essentially the radomes will be fabricated, tested and assembled the same." According to the Navy's evaluation, Raytheon's proposal "explained that changing the color of the radomes will

have minimal impact to their existing processes and fixtures."

Furthermore, even Vantage's proposal relies on past production of not only gray radomes but also a long list of white radomes. Under the subject heading "Past Performance," Vantage emphasized that it has produced hundreds of white radomes:

> Table 4.1 lists past performance for the testing and manufacture of Phalanx search and track radomes. Vantage has produced these units since 1985 and probably has manufactured more search radomes than any other organization. To date, as shown in Table 4.1, Vantage has delivered 525 search radomes and 53 track radomes. While the majority of these are white, 32 units have used precisely the LSA gelcoats and paints required by the current specification.

Of the twenty-eight contracts that Vantage listed, twenty-four contracts involved Vantage's manufacture of white radomes. The assertion that the contracting officer acted arbitrarily or capriciously in evaluating white radomes, defendant properly notes, is contradicted by Vantage's "statements in its proposal explaining how similar the production process is for white and gray radomes and boast[ing] of its significant history in manufacturing hundreds of white radomes."

As the GAO explained when it denied plaintiff's second protest, the RFP does not require that the Navy evaluate an offeror's technical qualifications solely on gray radomes. *See Vantage Assocs., Inc.*, 2003 CPD ¶ 32, at 7, 2003 WL 294376 ("[N]one of the RFP evaluation criteria require that an offeror have produced gray radomes in order to receive a favorable evaluation."). Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. *See* 48 C.F.R. § 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."). Under the RFP, at section L governing submission of Past Performance information, offerors were directed to submit "[c]ontract number(s) for current or previous contracts for the same or similar product(s),"

that will be evaluated "on the degree to which the Offeror has satisfied its customers." Moreover, offeror's technical narratives were to "include previous contracts of similar items." The express terms of the RFP simply do not support the plaintiff's proposition that gray radomes are significantly different from white radomes, or that even a small quantity of gray radomes significantly differentiates plaintiff's proposal from that submitted by Raytheon. The court also notes that, according to plaintiff, Vantage had produced thirty-two radome units using the gray gel coats and paints called for in the solicitation, roughly only 5.5 percent of its claimed total production. The record reflects that the Navy reasonably relied on the past production of white radomes in its evaluation.

Plaintiff further alleges that the Navy improperly evaluated and downgraded Vantage on three technical factors—Technical Capability, Quality Control System, and Test Equipment—based on Raytheon's June 24, 2002 report of test results on Vantage's gray search radome. Plaintiff also alleges that the reported RF failure, or the inability of the radome to remain transparent to RF radiation, occurred due to Raytheon's test of the radome in an upside down configuration, which is never encountered under actual usage. According to plaintiff, the radome failure occurred in an area that does not affect overall system performance. Furthermore, plaintiff argues that the failure of handle mounting holes on Vantage's radome occurred due to an alleged defect inherent in the Navy/Raytheon design. Plaintiff concludes that the Navy's failure to critically assess the Raytheon report of Vantage's gray radome test rendered the entire procurement process prejudicial and arbitrary.

Plaintiff disputes the results of Raytheon's "post-humidity RF testing," because the Navy conducted the test in an "upside down configuration never encountered in the real world." The Raytheon report stated:

> [the post-humidity RF] finding, in one context, is mitigated by the fact there is no radiation through the top of the Search Radome. However in another context, the mechanical characteristics of the Search Radome are susceptible to humidity.

There could be an occasion when the environmental relative humidity is high and the Search Radome is adversely affected. This could happen if the Radome were removed and placed on the deck of the ship during a maintenance activity.

Although plaintiff questions the gray radome RF test, which is not referenced in the second reevaluation by procurement officials, the court finds it reasonable for the Navy to be concerned with the performance of the entire gray radome, even if the possibility of failure could occur during ship maintenance procedures. Therefore, the Navy reasonably relied on Raytheon's RF test results during the bid evaluation process.

The administrative record also does not support plaintiff's position that Vantage's gray radome handle mounting holes failed testing due to a " 'defect' inherent in the Navy/Raytheon's design." The Navy did not make a change in the design, and even the statements in the record by Mr. Alpinieri, Vantage's CEO, contradict plaintiff's claim. In his comments to the GAO report, Mr. Alpinieri wrote:

> Regarding the Search radome, all of these design elements of the handle are specified *in detail* on the Navy drawings. The design has not changed through the 20–plus year life of the PHALANX Search radome. Vantage used this same proven design on the gray radomes which Raytheon purportedly "tested." We qualified the design in 1986. The only difference is that the radome tested by Raytheon–Tucson was gray, not white.... The only conclusion that I can draw from this alleged failure of the handle is that some over-testing or other unwarranted stress was placed on the handle. (Emphasis in original.)

Not only is Mr. Alpinieri's statement contrary to establishing a design defect that caused Vantage's radome to fail the handle mounting hole test, he actually supports the reliability of the handle design during the twenty year life of the PHALANX search radome. Furthermore, the administrative record contains no facts that support Mr. Alpinieri's speculation that "over-testing or other unwarranted stress" caused the handle mount hole failure. Finally, it is noteworthy

that Mr. Alpinieri, once again on behalf of Vantage minimized the difference between gray and white radomes: "The only difference is that the radome ... was gray, not white," undermining plaintiff's previously discussed claim that gray radomes are technically different than white radomes.

The Navy's second reevaluation summary of Vantage's proposal also does not support plaintiff's contention that the Navy unreasonably relied on Raytheon's PLI report in the instant procurement. The administrative record indicates that although Raytheon, under the authority of the Navy, published the overall results of the PLI on Vantage's gray radome, Derby City Engineering performed the Mechanical Load Testing on Vantage's gray radome. The administrative record states that Derby City Engineering designed and built "a fixture for applying loads to the handle mounting holes." According to Derby City Engineering, four of the ten mounting holes were damaged by small cracks, and three holes were totally damaged.

Under the subcategory "Technical Capability," the source selection board reasonably noted that Vantage's "Gray Search Radome failed the 'pull test' ...." Under the second subcategory, "Test Equipment," the Navy made no mention, either positively or negatively, of Raytheon's report on Vantage's gray radome. Finally, under the third disputed subcategory, "Quality Control System," the source selection board stated:

> A weakness in the Vantage proposal was their "strong recommendation" to waive the First Article Testing for the LSA Gray Radomes. They cite their previous experience in manufacturing thirteen sets of these Radomes, but they failed to mention the failure of the "pull test" on the Search Radome, even though they cite the test report in their proposal. The SSB believes their QA Department should not have recommended the waiver of First Article Testing (to save time and funding for this contract) since these Radomes have not been produced on a high quantity basis.

The Navy provided a rational explanation of why it considered Vantage's proposed waiver of First Article testing a weakness. The administrative record fails to support plaintiff's allegation that the Navy downgraded plaintiff on the basis of nonexistent deficiencies asserted by Raytheon. The Navy reasonably cited the Mechanical Load Test results conducted by a third party whose objectivity has not been challenged, Derby City Engineering. Finally, even if plaintiff could demonstrate that Vantage received lower ratings in certain subcategories than they should have received, plaintiff has failed to demonstrate prejudice, because Vantage still received the highest possible overall technical score of "Outstanding."

█ Plaintiff also contends that Raytheon won the contract award based on low price rather than on technical merit, contrary to the evaluation criteria of the solicitation. Plaintiff notes that the defendant's initial SSP used for the original contract award provided that, "[f]or purposes of the Government's best value tradeoff, Price is significantly more important than ... Technical and Past Performance." Plaintiff claims that during the Navy's first reevaluation, after Vantage's first GAO protest, the Navy continued to use this original SSP criteria, contrary to the evaluation criteria of the solicitation. The Navy's second reevaluation, also following Vantage's first GAO protest, plaintiff describes as, "pursuant to a Source Selection Plan never formally adopted ..., conducted with full awareness that Raytheon offered the low price." The procurement, according to plaintiff, "continued to be exactly what Defendant internally planned it to be, a low-price-wins competition." Plaintiff also contends that for years the defendant purchased white radomes by sealed bid, low-price procurements qualified among small business offerors and that plaintiff "was duped into increasing its price ...." If the RFP had stated forthrightly that this was a low-price-wins procurement among technically qualified offerors, Plaintiff's price would have been far lower than that which it actually offered." Defendant acknowledges that "the Navy originally erred in placing too much importance upon price," however, "the Government rectified this problem after the GAO protest was filed," during the second reevaluation by the Navy.

The administrative record contains two SSPs. The first SSP contains dates corresponding to the evaluation for the initial contract award and that of the Navy's first reevaluation after the first GAO protest. The first SSP stated that:

> The Offeror's proposal will be evaluated in accordance with the factors identified in Section M of the solicitation.... For purposes of the Government's best value tradeoff, Price is significantly more important than Technical and Past Performance.

A second, modified SSP, that was included with the second reevaluation materials in the record, which were dated October 3, 2003, stated that:

> The Offeror's proposal will be evaluated in accordance with the factors identified in Section M of the solicitation .... All evaluation factors other than price, when combined, are significantly more important than price. However, the importance of price as an evaluation factor will increase with the degree of equality of proposals in relationship to the technical scores. After evaluation of the Technical Proposal and price, price may be the deciding factor between two or more highly rated Technical Proposals.

In the original language of section M of the solicitation, the balance between technical scoring and price was described as follows:

> All evaluation factors other than price, when combined, are significantly more important than price. However, the importance of price as an evaluation factor will increase with the degree of equality of proposals in relationship to the technical scores. After evaluation of the Technical Proposals and price, price may be the deciding factor between two or more rated Technical Proposals.

A March 12, 2002, amendment incorporated into section M of the solicitation stated that:

> Offeror's proposal will be evaluated on the basis of Technical and Price. Technical evaluation will be based on five factors:

> Offeror's proposal will be evaluated on the basis of Technical and Price. Technical evaluation will be based on five factors:

> 1. Technical Capability

> 2. Past Performance

> 3. Production Capability

> 4. Test Equipment

> 5. Quality Control System

> Factors (2) and (3) are equal in importance and are more important than factor (1). Factors (4) and (5) are equal in importance and are less important than factor (1). The five (5) factors when combined are significantly more important than price.

Following the second reevaluation by the Navy, the source selection board gave Vantage and Raytheon the following technical scores in the evaluation summary:

| | | Raytheon | Vantage |
|---|---|---|---|
| 1. | Technical Capability | Outstanding | Good |
| 2. | Past Performance | Outstanding | Outstanding |
| 3. | Production Capability | Good | Outstanding |
| 4. | Test Equipment | Outstanding | Good |
| 5. | Quality Control System | Outstanding | Good |
| | Overall Technical Score | Outstanding | Outstanding |

The source selection board also described why Vantage and Raytheon both received "Outstanding" for their overall technical scores:

> Raytheon received an "Outstanding" rating in four out of five categories. The consensus of the board members was to give Raytheon an overall rating of Outstanding. As stated in the SSP, Past Performance and Production Capability are equal in importance and are more important than Technical Capability. Even though the board members rated [Raytheon's] Production Capability as "Good", they believe the "Outstanding" ratings in Technical Capability, Past Performance, Test Equipment and Quality Control System warrant an overall rating of "Outstanding".

> Vantage received an "Outstanding" rating in two out of five categories. The consensus of the board members was to give Vantage an overall rating of "Good"; however, the Source Selection Plan states that Past Performance and Production Capability are equal in importance and are more important than Technical Capability. The SSP also states that Technical Capability is more important than Test Equipment and Quality Control. Based on the SSP,

the Board members decided on an overall rating of "Outstanding".

The source selection board concluded that:

Since Raytheon and Vantage's technical proposals were rated Outstanding, price has now become the deciding factor. It is considered to be most advantageous to the Government to award this contract to the contractor offering the lowest total price (inclusive of all options). Raytheon's total price (inclusive of all options) is $1,621,080.00, which is $304,560.00 lower than Vantage's total price of $1,925,640.00.

A review of the solicitation and of the second reevaluation, including the final source selection board's evaluation summary, reflects a rational basis supporting selection of Raytheon by the Navy. The SSP used in the original contract evaluation and the first Navy reevaluation focused on price rather than technical evaluation, but the Navy corrected its earlier errors during the second reevaluation by first considering the technical proposals before turning to price as the deciding factor. Whatever earlier errors may have occurred, the second reevaluation was properly conducted. The solicitation issued on March 12, 2002, identified price as a factor in the bid process, and reads "the significance of price as an evaluation factor will increase with the degree of equality of proposals in relationship to the technical scores." The Navy reasonably relied upon price as the determining factor in awarding the contract because Vantage and Raytheon both received technically equal overall scores of "Outstanding," and Raytheon had the lower cost proposal.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for judgment on the administrative record and for permanent injunctive relief is **DENIED**. The defendant's motion for judgment on the administrative record is **GRANTED**. The clerk's office is directed to enter **JUDGMENT** in favor of the defendant. Prior to release of this opinion to the public, the parties shall review this unredacted opinion for competition sensitive, proprietary, confidential or otherwise protected information. In accordance with paragraph 9(b) of the court's February 26, 2003 protective order, the parties shall file a joint status report on Thursday, August 28, 2003. In the status report, the parties shall propose, with explanations, what previously sealed materials in the record or in this opinion continue to require protection, for what reasons and for what period of time. As part of the August 28, 2003 submission, the parties shall file a proposed redacted version of this opinion.

**IT IS SO ORDERED.**